**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Timothy JONES, Charles Wayne Norman, Perry Cecil Patronelli, and Richard Keith Hagler, Defendants–Appellants.**

No. 87–1153.

United States Court of Appeals,
Fifth Circuit.

Feb. 17, 1988.

As Corrected March 1, 1988.

Rehearing Denied March 17, 1988.

Paul E. Gartner, Jr., Waco, Tex. (Court Appointed), for Jones.

Ray Bass, Austin, Tex., for Norman.

Frank Maloney, S. Ronald Keister, Austin, Tex., for Hagler.

John C. Emerson, Austin, Tex., for Patronelli.

Jack Frels, LeRoy Morgan Jahn, Asst. U.S. Attys., San Antonio, Tex., for U.S.

Before BROWN, JOHNSON, and HIGGINBOTHAM, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

Four criminal defendants appeal from convictions for conspiracy to manufacture a controlled substance. We affirm the convictions, finding that the jury had sufficient evidence to support its verdict and that the prosecutor's closing argument, while highly improper, was harmless in light of the evidence of guilt. We also affirm the trial court's admission of certain recorded conversations and dismiss defendants' contention that the government's scheme to infiltrate the conspiracy was "outrageous conduct" inconsistent with due process. Finally, we reject the contentions of individual defendants that they were entitled to an entrapment instruction and a separate trial.

I

A jury found the defendant-appellants guilty of conspiracy to manufacture methamphetamine, a kind of "speed." The testimony of Gary Griffin, one of the co-conspirators, and Richard Tucker, an agent of the Drug Enforcement Administration, provided the bulk of the government's evidence.

In early 1986, defendant Timothy Jones contacted Griffin about locating someone who knew how to make speed. Griffin testified that he watched Jones, along with Richard Hagler and Charles Norman, attempt to produce the drug on a prior occa-

sion, but that they did not know how to achieve the necessary chemical reaction. They wanted someone who could salvage the chemical remains of their first attempt as well as assist them in producing another batch of the drug from scratch. In return for release of a debt owed to Jones, Griffin called Mark Bottomley, an acquaintance of Griffin's in Colorado.

Griffin did not know that Bottomley was a government informant. At the government's request, Bottomley introduced Griffin by telephone to Agent Tucker, who was posing as a chemist. They planned for Bottomley and Agent Tucker to go to Texas to oversee the manufacturing process. The government promised Bottomley a financial reward if the operation succeeded.

At a bar called Mulligan's, Griffin met with Jones and Perry Patronelli, who the government alleges provided financial support. Jones and Patronelli agreed to fly Bottomley and Agent Tucker to Austin and to provide keys to a house in Davilla, Texas, where the manufacturing would take place. Bottomley flew to Austin the next day using an airplane ticket purchased by Hagler on Norman's American Express card. Bottomley went with Griffin to Hagler's house. Griffin then called Agent Tucker to confirm that the necessary materials were on hand. Griffin and Bottomley spent the night at Hagler's house.

Agent Tucker went to Hagler's house the next day and inspected the materials. Griffin's "recipe" turned out to be not for speed, but rather for MDMA, a drug also known as "ecstasy." Although a few of the ingredients necessary to produce methamphetamine were on hand, several critical elements were missing. Agent Tucker dictated to Griffin a list of necessary chemicals and glassware, along with recommendations of stores where the materials could be purchased. Later, after Agent Tucker left, Griffin summoned Jones and Norman to the house and gave them a copy of the list of materials.

After Norman provided a key and a map, Griffin, Agent Tucker, and Bottomley drove to the Davilla house and Agent Tucker approved the location as a lab site.

Back at Norman's house, Norman gave Griffin $200 in expense money for Agent Tucker. Griffin suggested that Norman and Hagler go to Austin the next day to purchase the chemicals and glassware on Agent Tucker's list. Norman agreed to contact Griffin if they encountered difficulty. Agent Tucker sent Bottomley back to Colorado on the pretext of obtaining advance money from a possible buyer of the finished product.

The next morning, April 10, Norman and Hagler went to Austin carrying $1,500 in cash. They inquired at a photographic supply company Agent Tucker had recommended, and the salesman said, "You boys are making dope." Hagler replied, "It's not illegal to buy these chemicals, is it?" The salesman provided several of the items on the list, but told them that the critical ingredient, phenylacetic acid, would have to be purchased in San Antonio.

After talking with Norman later that day, Griffin told Jones that they needed $1,100–$1,200 to acquire enough phenylacetic acid. Griffin recalled Jones as saying, "Well, I don't have it on me; I'll have to get in touch with Perry." Griffin suggested they wire the funds to San Antonio. Jones later told Griffin that he had arranged for Patronelli to wire the funds by Western Union. In Temple, Texas, an individual identifying himself as Patronelli applied for a $1,100 money order payable to Norman at the San Antonio Western Union office. However, by the time the money was available in San Antonio, Norman and Hagler already had purchased a smaller quantity of phenylacetic acid and arranged for the rest to be shipped C.O.D. Hence, the money never was retrieved.

That same day, Agent Tucker met Griffin at the Hagler house, carrying a concealed tape recorder. Agent Tucker suggested that the four of them go to the Davilla house and prepare the lab when Norman and Hagler returned. Agent Tucker had arranged for the arrests to occur that evening.

Norman and Hagler arrived at Hagler's house around 7:00 p.m., loaded the chemicals and glassware into cars, and drove to

the Davilla house. During the drive, Agent Tucker recorded his conversation with Griffin, in which they discussed the conspiracy. Griffin indicated that Norman and Hagler were partners in the manufacturing operation, that Patronelli was the operation's financier and had provided access to the Davilla house, and that "Tim"— apparently meaning Tim Jones—was also a participant in the venture.

After arriving at the Davilla house, Norman insisted that they lock the front gate on his belief that Texas police could not lawfully enter a locked property; Hagler followed the suggestion and locked the gate. Once inside, Hagler volunteered to help prepare the materials. Agent Tucker instructed him to tear up aluminium foil strips that would be used for the chemical process, while he and Griffin went to the store. On the way, Griffin was arrested. Agent Tucker and other agents returned to the Davilla house and arrested Hagler and Norman. At the time of these arrests, everything necessary to the chemical process was present, except for hydrogen-chloride gas. However, no actual attempt to manufacture the drug was ever made.

Norman and Hagler were read their rights and each of them asked to speak with an attorney. On the advice of Assistant United States Attorney Jack Frels, however, the agents did not allow Norman and Hagler to make any phone calls or speak to an attorney. The next morning, April 11, and still lacking benefit of counsel, Norman agreed to make a monitored phone call to Patronelli. To entice Patronelli to make an incriminating statement, DEA agents had Norman call Patronelli and relate to him a ruse invented by the agents: Tucker had completed processing the chemicals left over from the earlier attempt, netting 34 ounces of methamphetamine; they had moved the lab to Bastrop, Texas, to evade discovery; and Tucker wanted $24,000 before he would make a new batch. Patronelli responded that "you need to go through (Jones) and he can get in touch with me and we'll do something.... Whatever is necessary." Before hanging up, however, Patronelli got Norman's phone number and promised to get back to him. Patronelli also instructed Norman to collect the wired money and asked whether they had cleaned up the Davilla house before leaving.

A few minutes later Patronelli called back and asked how much had been made and whether it came from "what we had to start with." Norman said they had made "34 pieces," and when asked to clarify what that meant he said, "We're talking about ounces." At the end of the conversation Patronelli said he would keep trying to contact Jones.

Jones called Norman twice. Jones reminded Norman that the deal was that Tucker would take two pounds and leave five for everyone else. At several points in the conversation Jones threatened to kill Gary Griffin and Agent Tucker if they did not surrender five pounds. Jones and Patronelli were arrested shortly thereafter. Jones was carrying a copy of the Western Union application to wire money.

The defendants each were charged with conspiracy to manufacture methamphetamine, a schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1), 846. Jones and Patronelli also were charged with use of a communication device (the Western Union money order) to facilitate the conspiracy, in violation of 21 U.S.C. § 843(b). The jury found defendants guilty. Hagler received a sentence of five years and a $2,500 fine; Norman, eight-years, $2,500; Patronelli, eight years, $2,500; and Jones, fifteen years.

Gary Griffin was charged with one count of conspiracy to manufacture a controlled substance and three counts of using a telephone in the commission of a felony. He plead guilty to the conspiracy charge, for which he was sentenced to eight years imprisonment. The government dropped the other charges in exchange for his testimony.

## II

We turn first to defendants' contention that the jury had insufficient evidence to reach guilty verdicts. Our review considers the evidence in the light most favorable

to the government to determine whether a reasonable jury could find that the evidence established guilt beyond a reasonable doubt. *See United States v. Bell,* 678 F.2d 547, 549 (5th Cir.1982) (en banc), *aff'd,* 462 U.S. 356, 103 S.Ct. 2398, 76 L.Ed.2d 638 (1983); *United States v. Cook,* 793 F.2d 734 (5th Cir.1986) (per curiam). And, as we stated in *Cook,* "[b]oth the fact of conspiracy and a defendant's participation in it may be proved by circumstantial evidence." 793 F.2d at 736.

Although we review separately the evidence presented against each defendant, the legal standard to be met is the same for all four defendants: the government must prove that an agreement to manufacture methamphetamine existed, that the defendant was aware of the agreement, and that he intended to join and further its cause. *See United States v. Glasgow,* 658 F.2d 1036, 1040 (5th Cir.1981). To establish that Jones and Patronelli violated 21 U.S.C. § 843(b),[1] the government must prove the knowing or intentional use of a communication device to commit, cause, or facilitate the commission of a narcotics offense. *See United States v. Phillips,* 664 F.2d 971, 1032 (5th Cir.1981), *cert. denied,* 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982).

### A. Jones

■ Gary Griffin's testimony, as corroborated by the recorded conversations between Jones and Norman after Norman's arrest,[2] provided sufficient evidence to sustain Jones' conviction on the conspiracy count. Griffin testified that Jones not only was aware of the conspiracy, but was its instigator. The jury could have concluded from the tapes that Jones intended to participate in the conspiracy with the specific intent to manufacture methamphetamine.

■ Jones' primary defense was that Griffin's testimony was fabricated. Griffin's credibility was questioned by his prior criminal record and the testimony of Alvin Collins. Collins testified that he had met Griffin during the trial while both were in the McLennan County Jail. According to Collins, Griffin said he conspired with the government to falsely prosecute the defendants. Collins came forward with the story, he said, after meeting defendant Jones on a different floor of the jail. Nevertheless, it was up to the jury whether to believe Griffin or Collins. *See United States v. Martin,* 790 F.2d 1215, 1219 (5th Cir.), *cert. denied,* — U.S. —, 107 S.Ct. 231, 93 L.Ed.2d 157 (1986).

The jury also had sufficient evidence to conclude that Jones helped send the Western Union money order in violation of 21 U.S.C. § 843(b). Both Jones and Patronelli contend that the government failed to prove that the money order "facilitated" the conspiracy. They argue that because Norman and Hagler departed San Antonio before any money was available at the Western Union office, the money order cannot be said to have furthered the manufacture of methamphetamine.

■ This argument misperceives the nature of the offense proscribed by section 843(b). It is enough that at the time the money was wired it appeared necessary to further the objective of the conspiracy; the government need not prove the conspiracy could not have been completed without it. Obviously Jones and Patronelli believed this to be the case and the fact that the money was not actually used to purchase ingredients of methamphetamine does not render the evidence insufficient to support the verdict. This is not a case like *United States v. Rivera,* 775 F.2d 1559, 1562–63 (11th Cir.1985), *cert. denied,* 475 U.S. 1051, 106 S.Ct. 1275, 89 L.Ed.2d 582 (1986), in which the defendant made telephone calls not to further drug distribution but rather to ask about his share of the proceeds. Nor is this case like *United States v. Les-*

---

1. It shall be unlawful for any person knowingly or intentionally to use any communication facility in committing or in causing or facilitating the commission of any act or acts constituting a felony under any provision of this subchapter or subchapter II of this chapter.

21 U.S.C. § 843(b).

2. As we explain in part IV of this opinion, the court committed no error in admitting these recordings for the jury's consideration.

*lie*, 411 F.Supp. 215 (D.Del.1976), in which the defendant made calls in furtherance of drug sales that never materialized. Here the conspiracy did materialize and the money order reasonably can be said to have been sent to facilitate it.

### B. Norman

Norman's defense at trial was that he believed the agreement was to manufacture "procaine," a non-controlled substance that may be used to dilute heroin or cocaine. As evidence Norman offered the testimony of a narcotics expert that the substance created by the initial manufacturing attempt contained benzoic acid, which Norman characterizes as an element of procaine but not an element of methamphetamine. Norman also relied on the testimony of Alvin Collins that Griffin said the defendants actually were attempting to make procaine.

However, as we explained above, the jury was entitled to believe Griffin's testimony rather than that of Collins. Norman's other actions, confirmed by testimony, also support his intent to join the conspiracy and achieve its objective. Most important, he purchased necessary supplies with his own money despite a salesman's accusation that the chemicals were associated with illegal drugs. Norman's illegal intent also is confirmed by his concern with locking the gate to the Davilla house in order to prevent entry of law enforcement agents.

Norman's counter-evidence gave the jury little reason to believe the defendants intended to make procaine. Norman's expert admitted that benzoic acid is not an element of procaine, although a different compound, parabenzoic acid, may be. The fact that the prior attempt resulted in a substance other than methamphetamine does not necessarily rebut an inference that methamphetamine was the product Norman intended to manufacture. This is not a case in which an attempt to distribute a controlled substance would have been impossible because the substance defendant purveyed, unbeknownst to him, was not an illegal drug. *See United States v. Oviedo,*

525 F.2d 881, 885 (5th Cir.1976). Obviously, success at the underlying offense is not a necessary element of conspiracy.

### C. Hagler

Hagler testified at trial that although he was aware that Griffin probably was involved in illegal activity, he had no idea that the plan was to manufacture methamphetamine. Although the evidence of Hagler's involvement is thinner than the evidence against Jones and Norman, primarily because Hagler had far less personal involvement with Griffin and Agent Tucker, the jury still had sufficient evidence to find that Hagler willfully associated himself with the conspiracy and participated with an intent to achieve its criminal objective.

Once again, it was not unreasonable for the jury to rely on Griffin's testimony that Hagler was present at a prior attempt to manufacture methamphetamine. In addition, Hagler must have been aware that he was involved in manufacture of an illegal substance when he was told so by the chemical salesman in Austin. At the Davilla house Hagler volunteered to prepare aluminum foil for the cooking process and locked the gate after hearing Norman say this would prevent legal entry by Texas authorities. These facts, even without more direct evidence of Hagler's intent to manufacture speed, constitute sufficient circumstantial evidence to tie Hagler to the conspiracy.

### D. Patronelli

The decisive evidence of Patronelli's involvement in the conspiracy was his conversation with Norman on April 11 in which he acknowledged the existence of an attempt to manufacture "pieces" and the use of a "cook" who was to receive a portion of the proceeds. The jury was entitled to interpret Patronelli's words as evidence of conspiracy despite Patronelli's testimony that he could not understand Norman because of an ongoing insulin reaction. Although other evidence of Patronelli's involvement—his assent to Jones' use of the Davilla property and his purchase of the Western Union money order of $1,100

—might be susceptible to a non-criminal interpretation, the jury reasonably could conclude that the cumulative effect of the evidence established Patronelli's participation in the conspiracy.

On this basis, moreover, it is a short step also to conclude that Patronelli intended to use the Western Union money order to further the conspiracy in violation of 21 U.S.C. § 843(b). As we explained with regard to Jones' conviction under this statute, it is not exculpatory that the money order may have been available to Norman and Hagler only after they were no longer in a position to use it for the purchase of methamphetamine ingredients.

### III

As we explained in our discussion of the sufficiency of the evidence, the defense offered the testimony of Alvin Collins, a resident of the McLennan County Jail, that Gary Griffin lied about the existence of a conspiracy. During his closing argument, Assistant United States Attorney Jack Frels commented on this testimony before the jury:

> You recall that Monday afternoon, for the very first time, [Collins] was transferred to the second and third floor [of the jail], where he would be right next door ... to the cell of Tim Jones. And when Tim Jones got back from court ... on Monday evening, he gave him this information and gave him the note [of his recollection about Griffin's statements]. Those lawyers heard that from Alvin Roy Collins. They brought that testimony into this court to you. Do you think that these lawyers believe that you are so naive and are a bunch of citizens who can be exploited by this kind of testimo-

ny, when they knew, I knew and you knew we didn't have court Monday.... Out of an absolute act of desperation, as a final grasp of hope in trying to get you to buy their various distorted defenses, they sponsor perjury. They bring you a lie.

The trial judge denied defense counsel's immediate motion for a mistrial, but instructed the jury to disregard the remark.

■ The government makes no attempt to argue that the comment was proper. Indeed, under our cases the comment was reprehensible. The prosecutor accused defense counsel of sponsoring perjury. At oral argument counsel conceded that this was the purpose of his argument but that he has never acted on such a belief. The prosecutor in a criminal case stands before the jury as the representative of the United States. With his considerable power, his leveled finger can sting. With that power comes the responsibility to act in a manner fitting that role.

Reversal and remand for a new trial is the most effective sanction for prosecutorial misconduct like that seen in this case. However, the Supreme Court consistently has stated that except for a narrow category of constitutional errors, we should reverse only where an error casts doubt on the correctness of the jury's verdict. "Where a reviewing court can find that the record developed at trial establishes guilt beyond a reasonable doubt, the interest in fairness has been satisfied and the judgment should be affirmed." *Rose v. Clark,* 478 U.S. 570, 106 S.Ct. 3101, 3107, 92 L.Ed.2d 460 (1986); *Delaware v. Van Arsdall,* 475 U.S. 673, 106 S.Ct. 1431, 1436, 89 L.Ed.2d 674 (1986); *see also United States v. Weddell,* 800 F.2d 1404, 1410–11 (5th Cir.1986).[3]

---

**3.** Although the Court declined to consider the harmlessness of a prosecutor's remark in *Darden v. Wainwright,* 477 U.S. 187, 106 S.Ct. 2464, 2473 n. 15, 91 L.Ed.2d 144 (1986), in determining whether the remark violated the Constitution the Court considered "the likelihood that the jury's decision was influenced by argument." *Id.,* 106 S.Ct. at 2473. We note by way of comparison that the prosecutor's comments in *Darden* were startling. Among other things, the prosecutor characterized the defendant as an "animal" who

shouldn't be out of his cell unless he has a leash on him and a prison guard at the other end of that leash.... I wish [the victim] had had a shotgun in his hand when he walked in the back door and blown [the defendant's] face off. I wish I could see him sitting here with no face, blown away by a shotgun.... I wish someone had walked in the back door and blown his head off at that point.

*Id.* at 2471–72 nn. 11, 12.

In addition, while our power to reverse a conviction for prosecutorial misconduct no doubt is greater on direct review of a federal trial than it would be on habeas review, our supervisory responsibility still does not permit us to ignore the actual effect of the error. Proper supervision requires us at least to balance the need to protect the integrity of federal trials against the practical interest in giving finality to an accurate and fair verdict; we cannot by our supervisory power reverse a conviction for trial error that was harmless. *See United States v. Hasting*, 461 U.S. 499, 506, 103 S.Ct. 1974, 1979, 76 L.Ed. 2d 96 (1983).

■ With this in mind, we consider whether the prosecutor's comments deprived defendants of a fair trial in light of factors that have guided us in the past: the magnitude of the prejudicial effect of the statements, the efficacy of any cautionary instructions, and the strength of the evidence of defendant's guilt. *United States v. Cardenas*, 778 F.2d 1127 (5th Cir.1985).

■ In gauging the magnitude of prejudicial effect it is helpful to look at the evidence to which the prosecutor's comment related. The prosecutor argued that Alvin Collins perjured himself in testifying that Griffin admitted to fabricating testimony and conspiring with federal agents to falsely prosecute the defendants. From our examination of Collins' testimony we are persuaded that the jury had ample reason to disbelieve Collins even in the absence of the prosecutor's accusatory statements.

Most important, Collins' testimony was no more credible than Griffin's; both are convicted criminals. In addition, Collins admitted that he had been in contact with Jones prior to his alleged conversation with Griffin. Jones could have implanted the tale in Collins' mind before Collins even met Griffin. For this reason, the prosecutor's comments struck at an aspect of the case that had little bearing on guilt. The magnitude of the prosecutor's comment, while it no doubt improperly impugned the integrity of defendants' attorneys, had little chance of affecting the determination of guilt.

Moreover, the judge immediately issued a curative instruction for the jury to ignore the prosecutor's comment, which we have no reason to believe was not followed. In addition, the prejudicial effect of the comment was outweighed by the other evidence of defendants' guilt. As we have explained in our discussion of the sufficiency of the evidence, a great deal of proof linked each defendant with the conspiracy.

## IV

To prove that Jones and Patronelli participated in the alleged conspiracy, the government introduced tape recordings of the telephone conversations Norman had with Jones and Patronelli on the morning after Norman's arrest. Jones and Patronelli make two challenges to the admission of these recordings. First, they contend that the four conversations should have been excluded under federal statutes that make it illegal for law enforcement officers to intercept communications without a warrant, 18 U.S.C. § 2515, unless the intercept falls within specified exceptions, 18 U.S.C. § 2511. Second, Jones and Patronelli argue that the statements are inadmissible hearsay.

### A. Wiretapping Statute

■ As to the first argument, the government argues that the evidence comes within the exception permitting wire interception where "one of the parties to the communication has given prior consent to such interception." 18 U.S.C. § 2511(2)(c). Although the burden is on the government to prove consent, in most cases we find voluntariness where "the informant placed the telephone call knowing that it would be monitored." *United States v. Kolodziej*, 706 F.2d 590, 593 (5th Cir.1983). It is undisputed that Norman was aware that the conversation was monitored. Moreover, the fact that his consent was induced by the prospect of leniency, by itself, does not undermine this consent. *See United States v. Llinas*, 603 F.2d 506, 508 (5th Cir.1979), *cert. denied*, 444 U.S.

1079, 100 S.Ct. 1030, 62 L.Ed.2d 762 (1980); *United States v. Juarez,* 573 F.2d 267, 278 (5th Cir.), *cert. denied,* 439 U.S. 915, 99 S.Ct. 289, 58 L.Ed.2d 262 (1978).

However, Jones and Patronelli urge that two circumstances surrounding Norman's decision to participate in the conversations indicate coercive circumstances. First, although Norman asked to speak to an attorney upon arrest none was provided before he made the calls. Second, the arresting agents told Norman that in addition to fifteen years for conspiracy to manufacture methamphetamine, he was also facing another fifteen years for possession with intent to distribute. This representation was wrong because, as the agents must have known at the time, no methamphetamine had been produced.

The fact that Norman did not have the benefit of counsel before deciding to make the call does not vitiate his consent for the purposes of the wiretap statute, even though the trial court ruled that Norman's lack of counsel made the conversations inadmissible as to Norman himself. The trial court ruled that use of the tape recordings against Norman would have violated his sixth amendment right to be represented by an attorney. *See Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). The same reasoning, however, does not support exclusion of the evidence under the wiretap statute. The interest in privacy protected by the statute is more narrow than the panoply of legal rights vindicated through a defendant's access to counsel. The privacy interest may be waived even though the broader protection of counsel has not been provided. To hold that a conversant's consent is not voluntary unless he had legal counsel would be to assign the wiretap statute a supervisory purpose for which it was never intended. It was enough, then, that Norman participated with knowledge that agents were monitoring the conversations.

■ Likewise, the fact that the agents overstated the possible sentence Norman faced if convicted did not render his consent invalid under the wiretap statute. Our court has stated that consent may be invalid under § 2511(2)(c) if the informant's cooperation is secured by threats of "prosecutorial action which had no realistic foundation." *Kolodziej,* 706 F.2d at 595 (quoting *United States v. Horton,* 601 F.2d 319, 323 (7th Cir.), *cert. denied,* 444 U.S. 937, 100 S.Ct. 287, 62 L.Ed.2d 197 (1979)). Whatever the degree of exaggeration necessary to render otherwise voluntary participation invalid, however, the agents' statements here do not rise to such a level. Norman had plenty of time to consider whether to participate in the recorded conversations, and it is difficult to conclude that his decision would have been any different if he thought he faced only fifteen years. Thus, Norman's consent was valid and § 2515 is no bar to admission of the taped conversations.

### B. Hearsay

■ The trial court did not set forth specific grounds for admitting the recordings over defendants' objections that the statements contained therein were inadmissible hearsay. The government urges that the statements are not hearsay and even as hearsay they should come within the exceptions for admissions against interest, *see United States v. Killian,* 524 F.2d 1268, 1273 (5th Cir.1975), *cert. denied,* 425 U.S. 935, 96 S.Ct. 1667, 48 L.Ed.2d 177 (1976), and statements made in furtherance of a conspiracy, *see United States v. Meacham,* 626 F.2d 503, 510 n. 8 (5th Cir.1980).

Whether or not the statements might fall under one or more hearsay exceptions, the judge acted within his discretion to rule that the statements did not constitute hearsay: they were introduced not to prove the truth of the matters asserted therein, but rather to prove that Patronelli and Jones were aware of the conspiracy. As was the case in *United States v. Postal,* 589 F.2d 862, 888 (5th Cir.), *cert. denied,* 444 U.S. 832, 100 S.Ct. 61, 62 L.Ed.2d 40 (1979), "the mere fact that [defendant] made the statement is relevant to the issues of [his] knowledge of the conspiracy and his participation in it." *See also United States v. Bobo,* 586 F.2d 355, 371 (5th Cir.1978), *cert. denied,* 440 U.S. 976, 99 S.Ct. 1546, 59

L.Ed.2d 795 (1979). As Professor McCormick explains: "Proof that one talks about a matter demonstrates on its face that he was conscious or aware of it, and his veracity simply does not enter into the situation." *McCormick on Evidence* § 249, at 592 (2d ed. 1978); *see also United States v. Webster*, 750 F.2d 307, 330–31 (5th Cir. 1984); *United States v. Bankston*, 603 F.2d 528, 531 n. 1 (5th Cir.1979).

Here the government did not use the statements to prove that Patronelli and Jones acted in response to the government's fictional scenario—indeed, there were no actions in response because both were arrested soon after the calls were made. Rather, the statements were used to prove that Jones and Patronelli were aware of the attempt to manufacture speed, the terms of the arrangement with Agent Tucker, and the Western Union money order. This use of the recordings does not implicate the hearsay rule.

## V

■ Each defendant complains that the government was so heavily involved in the criminal enterprise that the convictions violate due process. In *United States v. Russell*, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973), the Supreme Court, while limiting the entrapment defense to cases in which the defendant was not "predisposed" to commit an offense, reserved an exception: "[W]e may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction...." 411 U.S. at 431–32, 93 S.Ct. at 1642–43.

Our cases have defined the contours of the "outrageous conduct" defense but we have never applied it to reverse a criminal conviction. *See United States v. Stanley*, 765 F.2d 1224, 1230–32 (5th Cir.1985); *United States v. Yater*, 756 F.2d 1058, 1064–66 (5th Cir.), *cert. denied*, 474 U.S. 901, 106 S.Ct. 225, 88 L.Ed.2d 226 (1985); *United States v. Tobias*, 662 F.2d 381, 385–87 (5th Cir.1981), *cert. denied*, 457 U.S. 1108, 102 S.Ct. 2908, 73 L.Ed.2d 1317 (1982); *United States v. Graves*, 556 F.2d 1319, 1323–26 (5th Cir.1977), *cert. denied*, 435 U.S. 923, 98 S.Ct. 1485, 55 L.Ed.2d 516 (1978). However, we have recognized that the government's actions in *Tobias* "set the outer limits to which the government could go in its quest to ferret out and prosecute crimes in this circuit." *Yater*, 756 F.2d at 1065. In *Tobias*, the defendant ordered chemicals to manufacture cocaine from a supply company that actually was run by the DEA. Before the chemicals were delivered, however, the defendant cancelled his order, fearing that he lacked the necessary expertise. A DEA agent posing as the supply company's employee suggested that the defendant try to manufacture PCP instead. The defendant paid $500 for the necessary materials, which the DEA sent. Later, the DEA raided the defendant's apartment and found PCP manufactured according to the government's instructions. This court found the government's conduct was not sufficiently "outrageous" to violate due process.

The cases demonstrate that outrageous involvement turns upon the totality of the circumstances with no single factor controlling.... The DEA, in this case, did not initiate contact with Tobias.... The crucial factor in this total fact picture is the step-by-step advice given by the DEA agents. This advice was given to Tobias or his wife on more than thirteen occasions. On each occasion, however, Tobias or his wife contacted the DEA. This would be a more difficult case if the DEA had pursued Tobias by repeated phone calls and encouragement. But here, the drug transaction would have stopped at any time that Tobias made no further calls. Instead of being a *predisposed inactive participant* in this scheme, ... Tobias was a *predisposed active participant*, motivated solely by a desire to make money.

662 F.2d at 387 (emphasis retained).

We also have noted that a Third Circuit case, *United States v. Twigg*, 588 F.2d 373 (3d Cir.1978), presented facts on which a finding of outrageous conduct might be appropriate. *See Tobias*, 662 F.2d at 386.

There the government convinced Kubica, who earlier had been convicted of manufacturing speed, to instigate a speed-manufacturing operation with Neville. The government supplied the critical chemical, phenyl-2–propanone, 20 percent of the necessary glassware, and a rented farmhouse in which to work. Neville, with Kubica's assistance, purchased the other necessities and recruited Twigg, who owed Neville a debt, to run errands. Kubica operated the lab for a week, with "minor assistance" from Neville and Twigg. The extensive government assistance, combined with Twigg and Neville's marginal predisposition to commit the offense, supported reversal. The court decided that "the government may not instigate the criminal activity, provide the place, equipment, supplies and know-how, and run the entire operation with only meager assistance from the defendants without violating fundamental fairness." *Tobias,* 662 F.2d at 386.

On the basis of the record, we cannot conclude that the government's conduct in this case reached the level of outrageousness found in either *Twigg* or *Tobias.* The scheme was not suggested by the government, nor did the government pay for the necessary materials or provide the lab site. At most, the government supplied scientific expertise and direction, just as it did in *Tobias.* Hence, the government's conduct here was not sufficiently outrageous to render the convictions contrary to due process.

## VI

Hagler also challenges the trial court's refusal to instruct the jury on the defense of entrapment. At the threshold, we reject the government's argument that Hagler's testimony was inconsistent with an entrapment defense. In *United States v. Henry,* 749 F.2d 203 (5th Cir.1984) (en banc), we adopted a hybrid rule governing the entrapment defense. Although we would not permit a defendant to assert entrapment while also denying that he committed the criminal acts underlying the indictment, *see Stanley,* 765 F.2d at 1232, the *Henry* rule

permitted a defendant to pursue an entrapment defense even though he denied having the criminal intent which is an element of the crime charged. *Henry,* 749 F.2d at 205.

However, the Supreme Court recently rejected this approach in *Mathews v. United States,* —— U.S. ——, 108 S.Ct. 883, 99 L.Ed.2d 54 (1988). The defendant in *Mathews* sought an entrapment instruction even though he denied having any criminal intent. The Seventh Circuit affirmed the district court's refusal to instruct the jury on entrapment, holding that a defendant may plead entrapment only if he admits committing all elements of the crime. The Supreme Court reversed, declaring that "even if the defendant denies one or more elements of the crime, he is entitled to an entrapment instruction whenever there is sufficient evidence from which a reasonable jury could find entrapment." *Mathews,* No. 86–6109, slip op. at 8. This language indicates that the Supreme Court now would permit a defendant to assert entrapment while denying any or all elements of the crime, including intent. Hence, while the result in *Mathews* is not inconsistent with the *Henry* rule, we conclude that *Henry* is no longer controlling law in this circuit.

The question, then, is whether Hagler can point to sufficient evidence at trial to show that the jury could have had a reasonable doubt concerning entrapment. *See also United States v. Nations,* 764 F.2d 1073, 1079 (5th Cir.1985). Hagler's burden has two parts: he must point to evidence indicating (1) governmental inducement that might cause him to act criminally where he otherwise would not, and (2) his lack of intent, before contact by governmental agents, to commit the crime charged. *Henry,* 749 F.2d at 207; *see also Mathews,* at ——, 108 S.Ct. at 888.

Although Hagler might have satisfied the second element through his own testimony, we find no evidence in the record indicating governmental inducement. Agent Tucker's conduct amounted to no more than an offer of expertise. He

had little contact with Hagler. He did not encourage Hagler to become involved in the conspiracy.

■ Nor does the record show that Hagler was induced to participate by the efforts of Gary Griffin, under a theory that Griffin's conduct should be attributed directly to the government. We have recognized that the government may entrap a defendant through the actions of an "ignorant pawn." *See United States v. Anderton*, 629 F.2d 1044, 1047 (5th Cir.1980); *United States v. Fischel*, 686 F.2d 1082, 1085–86 (5th Cir.1982). However, not only does Gary Griffin fail to qualify as an "ignorant pawn," Griffin's conduct did not constitute inducement sufficient to raise an entrapment defense.

The record makes it clear that Griffin was not manipulated by government agents. Most important, it was Griffin who contacted Bottomley, not vice-versa. And unlike the "ignorant pawn" in *Anderton*, the government here had no means by which to coerce or deceive Griffin into advancing the aims of the conspiracy. The only influence the government had over Griffin was Agent Tucker's monopoly of competence, and this provides no basis to conclude that Griffin was the government's pawn.[4]

Moreover, Griffin's influence over Hagler cannot reasonably be characterized as inducement. The fact that Hagler may have helped in part to satisfy a debt to Griffin does not in any way prove that Griffin implanted his criminal intent. It merely establishes that Hagler's intent to join the conspiracy was motivated in part by financial reward.

## VII

Defendant Norman contends that the trial court's refusal to sever his case from the trial of the other defendants constituted an abuse of discretion. *See United States v. Massey*, 827 F.2d 995, 1004 (5th Cir.1987). Keeping in mind that defendants who are indicted together generally should be tried together, *United States v. Wheeler*, 802 F.2d 778, 782 (5th Cir.1986), *cert. denied*, —— U.S. ——, 107 S.Ct. 1354, 94 L.Ed.2d 524 (1987), we consider the balance between the prejudice to Norman of a joint trial and the public's interest in judicial efficiency. *See United States v. Fortna*, 796 F.2d 724, 737 (5th Cir.), *cert. denied*, —— U.S. ——, 107 S.Ct. 437, 93 L.Ed.2d 386 (1986).

■ Norman identifies four ways in which the joint trial might have prejudiced him, the first being that the jury was permitted to hear the recorded telephone conversations of April 11, evidence that the trial court determined would not have been admissible in a separate trial of Norman.[5] When evidence is admitted against one codefendant but would not be admissible against the other, severance is necessary unless the jury could be expected to follow the court's instruction to disregard. *See United States v. Salomon*, 609 F.2d 1172, 1175 (5th Cir.1980).

■ Here we are confident that the jury was able to follow the court's limiting instruction. The instruction left little room for confusion as to against whom the evidence would be admissible. Our confidence is enhanced by the fact that the jury was aware, from the testimony of Hagler, that Norman's statements during the conversations with Patronelli and Jones largely were read from a script prepared by DEA agents. Insofar as Norman's statements encompassed fictional events—a fact made quite clear to the jury—any implied admission of guilt was made less damaging. Likewise, defense counsel emphasized before the jury that Norman's participation in the conversations was made under cir-

---

**4.** We dismiss as unfounded Hagler's claim that Griffin was not only the government's "ignorant pawn," but that the jury could have concluded that Griffin was working as a government agent the entire time. The jury was aware of the fact that Griffin himself faced a conspiracy charge, for which he received an eight-year sentence.

**5.** We assume without deciding that the statements would have been excludable as to Norman because his consent to participate in the conversations was obtained before his request for an attorney had been honored.

cumstances indicating at least a measure of duress.

■ Norman's second basis for severance—that a joint trial prevented him from calling to the stand one of the codefendant's lawyers—also lacks any significant danger of prejudice. Hagler called for the testimony of John Emerson, the attorney for Perry Patronelli, about an interview Emerson had with Griffin, the government's primary witness. According to Norman, in that interview Griffin contradicted his trial testimony about the April 7 meeting at Mulligans between Griffin, Jones and Patronelli; in the interview Griffin allegedly said Patronelli offered to give the Davilla house keys to "Tim" (Jones) and never mentioned Norman. Because this version might have been considered inconsistent with Griffin's trial testimony, Norman argues that the denial of severance deprived him of important impeachment evidence.

■ Where a joint trial deprives a defendant of a "valuable witness," severance is required only if a defendant first establishes a bona fide need for the testimony, the substance of the desired testimony, its exculpatory effect, and that the witness indeed would have testified at trial. *See United States v. Holcomb*, 797 F.2d 1320, 1325 (5th Cir.1986) (quoting *United States v. Johnson*, 713 F.2d 633, 640 (11th Cir. 1983), *cert. denied*, 465 U.S. 1081, 104 S.Ct. 1447, 79 L.Ed.2d 766 (1984)). Even assuming Emerson would have testified at a separate trial for Norman, we find that the exculpatory effect of his testimony would have been slight at best. The alleged discrepancy in Griffin's testimony related to a minor aspect of the government's case against Norman. Moreover, the testimony could not have established that Griffin had knowingly altered his recollection of the events; when asked at trial Griffin said he could not remember what he stated in the

interview. Lastly, Griffin's attorney, who was also present at the interview, recalled that Griffin mentioned two names: "Tim" (Jones) *and* "Charlie" (Norman).

Severance also was required, according to Norman, because Patronelli's lawyer commented on Hagler's decision not to testify. In his opening statement Mr. Emerson said to the jury:

> Now you are going to ultimately judge this man, ladies and gentlemen, a heavy, heavy responsibility. You are going to pass judgment on him. And so my feeling is, it's only appropriate that if you're going to judge this man, that you know what he had to say about this.

After objection, the trial judge immediately instructed the jury that the Constitution protects a defendant's right not to testify.

■ This comment, even though it was made by counsel for a codefendant, could merit reversal if construed as a reference to the other defendants' decision to invoke the fifth amendment privilege not to testify, and if it was not harmless. *See De Luna v. United States*, 308 F.2d 140, 154 (5th Cir.1962). Even broadly interpreted, however, the comment was not a reference to Hagler's failure to testify; it neither was intended to refer to defendant's silence nor was it of such a character that the jury would naturally and necessarily take it to be a comment on defendant's silence. *See United States v. Edwards*, 576 F.2d 1152, 1154 (5th Cir.1978). We faced a similar situation in *United States v. Vera*, 701 F.2d 1349, 1363 (11th Cir.1983), where we decided that, "The mere favorable observation of the willingness of one of several co-defendants to testify does not constitute an impermissible comment on the failure of the other co-defendants to testify." Hence, Emerson's comment could not have prejudiced Hagler, so no possible grounds for severance arose as a result.[6]

---

6. Relatedly, but outside the context of severance, Jones argues that the government's attorney commented on Jones' decision not to testify, entitling Jones to a new trial. The prosecutor's statement came in an objection, during cross-examination of Griffin, to Griffin being asked where Jones wanted to set up the methamphetamine lab. The prosecutor said,

> Your Honor, I object. That calls for speculation on Mr. Griffin's part. That's a question possibly for Mr. Jones.

We can discern from this comment no manifest intention to comment on Jones' decision not to

Norman's fourth and final argument for severance is that he was prejudiced by the fact that Jones, in the recorded telephone conversation of April 11, threatened to kill Gary Griffin and Agent Tucker. In some cases, such as where evidence is admitted indicating that a codefendant committed a serious crime unrelated to the present charge and the other defendant, the spillover effect of such evidence may create a risk of prejudice requiring severance. *See, e.g., United States v. Engleman,* 648 F.2d 473, 480–81 (8th Cir. 1981) (finding that defendant entitled to severance from trial of codefendant who previously committed murder). However, where it is likely that a properly instructed jury would contain the effect of such evidence and apply it only against the culpable party, denial of severance is not an abuse of discretion. *See Massey,* 827 F.2d at 1004–05; *United States v. Avarello,* 592 F.2d 1339, 1346 n. 10 (5th Cir.), *cert. denied,* 444 U.S. 844, 100 S.Ct. 87, 62 L.Ed.2d 57 (1979). We are satisfied that this is such a case.

Moreover, we also reject Hagler's claim that these four grounds for severance, although individually insufficient to render a joint trial unfair, cumulatively required a separate trial. *See United States v. Truslow,* 530 F.2d 257, 261 (4th Cir.1975) (finding that severance mandated by combination of prejudicial evidentiary admissions). Hagler's last three grounds for severance, in our opinion, have little or no prejudicial impact. The minimal prejudice that might have resulted from the admission of the recorded conversations is not so close to an unacceptable level to render the last three of any marginal significance. Hence, the trial court acted within its discretion to deny severance.

AFFIRMED.

testify. Nor do we think it would have led the jury to interpret it as such. The comment merely emphasized that the proposition that it was Jones and not Griffin who best understood Jones' intentions.