JOY COSSICH LOBRANO, Judge.
11 Following a jury trial, William T. Ba-ham (“defendant”) was convicted of second degree murder[1] for the death of Errol Meeks and sentenced to life in prison. Defendant appealed. For the reasons that follow, we affirm defendant’s conviction and sentence.
On the night of January 17, 2011, Meeks was at Friar Tucks bar with Larry Brown, a relative. Donald Oliver (nicknamed “Diesel”), who knew Meeks through a friend, was also at the bar. Defendant and two acquaintances, Derrick Lotz (nicknamed “Pops”) and Mitchell Marks were among the other patrons at Friar Tucks that night.
Darnell Lawrence, a bouncer at Friar Tucks, was on duty the night of January 17, 2011. During the evening, defendant and Oliver were involved in a fight in the bar’s men’s room. Upon learning of the fight, Lawrence broke it up and returned to his position at the door. After the incident, Oliver left the bar. Defendant and his friends also left. However, defendant left to retrieve his gun because “[h]e was mad and he wanted to smash” Oliver. *700 Derrick Lotz, Marks, and Robert Lotz (nicknamed “Rough” or “Ruffy”) “tr[ied] to talk [defendant] out of it,” but they eventually drove back to Friar Tucks in Derrick Lotz’s white Chevrolet |2Monte Carlo. Derrick Lotz (the driver) and defendant (the front passenger) exited the vehicle and approached the bar.
Lawrence, who was still stationed at the door, saw Meeks leave the bar. Defendant walked into the bar for a few seconds, abruptly turned around and walked out, following Meeks and trailed by Derrick Lotz. A few seconds later, as Marks and Robert Lotz were exiting Robert Lotz’s vehicle, multiple gunshots rang out, and Meeks fell to the ground. Marks and Robert Lotz immediately got back in their vehicle, and defendant ran from the bar and “jumped in the truck” with them. Defendant had a gun, “silver with a black handle” and “[b]etween a 9 and a 40” caliber, in his hand. Robert Lotz drove them to defendant’s grandmother’s house, and defendant’s grandmother then drove defendant across the river.
New Orleans Police Department (NOPD) Officer Robert Ponson arrived on the scene outside Friar Tucks shortly after 11:00 p.m., and a Friar Tucks employee handed him several cartridge casings that were fired from of a 40-caliber handgun. Lawrence approached NOPD Detective Kevin Williams, an investigator on the scene, and identified the shooter as a man named “Will” who frequented Friar Tucks once or twice a week. Detective Williams relayed the identification information to NOPD Detective Robert Hurst, the lead detective on the case. Lawrence also identified Derrick Lotz as the man standing behind defendant at the time of the shooting in the video of the incident recorded by the bar surveillance system.
The following day, Detective Hurst interviewed Derrick Lotz about the shooting. Derrick Lotz confirmed that he was standing on the bar’s porch behind defendant when defendant shot Meeks. He identified defendant as the shooter and picked him out of a photographic lineup.
IsNOPD Detective Maggie Darling visited Marks in prison on May 19, 2011, to interview him about the shooting. Marks gave Detective Darling a detailed statement of the incident, which was audio-recorded. Marks confirmed that defendant was involvéd in an altercation in the bar bathroom with another patron who pushed defendant’s head in the toilet. According to Marks, defendant had a swollen face, was very mad, and told him that he wanted to get his gun “to smash that dude.” Marks then left the bar with defendant and accompanied him to his grandmother’s house, where defendant retrieved his gun. Marks continued:
[A]fter that we went — we would go and we were trying to talk him out of it. He was on his way there.... We got by Ruffys house. Me and Ruffy was [sic] in a. car and him and Pops was [sic] in the truck. I mean the car and they went around there. Me and Ruffy was [sic] about to go inside. As we get [sic] out of the truck we just heard gunshots. Everybody got scared. We got back in the truck. He ran our way. He jumped in the truck with us.
Marks described the gun as between a nine or a forty caliber and silver with a black handle. After he gave his statement, Marks placed a call from prison that same day to his girlfriend and told her that he was going to play, dumb at trial.
On November 4, 2011, both defendant and Gregory L. Pelfrey, another Orleans Parish Prison inmate, had hearings scheduled in Orleans Parish Criminal District Court, Section L. Consequently, they, along with three other inmates, were held in the same holding cell, or dock, just *701 outside the courtroom while they awaited their respective hearings. Defendant and Pelfrey had never met each other before that day, and did not see each other again until the day of defendant’s trial.
While waiting in the Section L dock, defendant admitted to the murder, announcing to the other inmates that the police had no evidence against him because he threw his gun into the river. He also told the other inmates that one of the key witnesses in his case was an acquaintance who was not going to show up |4for trial. Defendant told the inmates that his attorney was John Fuller. Around noon, Mr. Fuller came into the docks. At that point, defendant and Mr. Fuller moved toward the toilet, and defendant handed Mr. Fuller a document. Defendant then came back to the other inmates and said that his next court date was on December 15, 2011. After returning to his prison cell, Pelfrey filled out a grievance form, declaring what he had heard from defendant, and passed it to a deputy. From that point until the trial, Pelfrey had no contact with law enforcement about defendant’s case.
On a phone call from the prison around 2:00 p.m., on November 4, 2011, defendant stated that he had given something to Mr. Fuller, his attorney, earlier that day. Additionally, defendant stated that his next court date was December 15, 2011.
The record was reviewed for errors patent and none were found.
In the first assignment of error, defendant contends that his right to a fair trial was violated when the prosecutor, Mr. Napoli, made numerous personal attacks on defense counsel, Mr. Fuller, during the testimony of Mitchell Marks, a state witness.
At trial, Marks recanted his prior recorded statement to Detective Darling, claiming he was coerced with the threat of a murder charge. He denied returning to the bar with defendant or having any knowledge of events related to the shooting. In an attempt to refresh Marks’ memory, the following dialogue occurred among the prosecutor, the defense attorney and the trial court:
MR. NAPOLI: ... Isn’t it a fact that on these jail tapes that you talk about how this defense attorney has been encouraging you not to come to court?
| fiMR. FULLER: Objection! That’s a lie! That’s a bad lie! I have never seen this man before in my life!
THE COURT: Whoa, whoa, whoa! This is cross-examination of a hostile witness. He can ask him whatever he wants.
MR. MARKS: I don’t know that man.
MR. NAPOLI: You never said that on the jail tapes?
MR. MARKS: I don’t know what I said, but I don’t know him.
MR. NAPOLI: Judge, at this time I would request permission to play the jail calls as impeachment.
Later during the questioning of Mr. Marks, the following occurred:
MR. NAPOLI: Judge, we would like to play the part now about the attorney.
MR. FULLER: Yeah, I would like to hear that part actually.
THE COURT: Well that makes all of us. We all want to hear.
(Tape played at this time.)
MR. FULLER: Objection!
MS. BERTHELOT: Excuse me!
THE COURT: Stop it! Stop it!
MR. FULLER: They specifically said that I said and that is clearly not the case.
THE COURT: That’s sustained.
MR. NAPOLI: Let me ask you this. Isn’t it true that William Baham told *702 you that his attorney didn’t want you to come to court?
MR. MARKS: No.
MR. NAPOLI: Play it.
THE COURT: William Baham told you that his attorney — that’s sustained.
MR. NAPOLI: Judge—
THE COURT: There is no foundation for the conversation between Baham and Fuller. It would be attorney client privilege. It’s sustained.
| f,MR. NAPOLI: While you were, on the docks — has there every [sic] been a time when you are on the docks with William Baham?
MR. MARKS: One time.
MR. NAPOLI: When he came up to you that one time didn’t he encourage you not to come to court?
MR. MARKS: No.
MR. NAPOLI: He didn’t?
MR. MARKS: No.
MR. NAPOLI: Judge, at this time we would request to play that call now considering that that is directly—
THE COURT: You can play anything that has something to do with Baham and this man, but I certainly didn’t hear anything that placed counsel Fuller in any way shape or form. Counsel Fuller would not be bound by anything that his client allegedly told somebody else when he wasn’t present or knew about.
MR. NAPOLI: But if he instructed him to do it though, Judge.
THE COURT: We don’t have that and strike that. Ignore that. Be careful. You are getting ready to start treading water.
(Tape played at this time.)
MR. NAPOLI: So when you were on the docks with William he told you that the instructions of his attorney was for you not to come to court?
MR. MARKS: No. I asked him — I asked him what was it because I thought his lawyer sent me a subpoena.
MR. NAPOLI: I have no further questions, Judge.
THE COURT: I want you to put it out of your head that there was any wrongdoing whatsoever by Mr. Fuller. This witness could or could not be telling the truth. He may or may not have spoken with the accused on this matter. His voice is not on the tape and for Mr. Fuller to be responsible for something this man allegedly had a conversation with this man that we have not heard. I ask you to take it with a grain of salt relative to Mr. Fuller.
|7On cross examination by defense counsel, Marks explained that he was served a subpoena while in court on a probation violation hearing. He identified Ms. Berthelot, one of the prosecutors, as the person who handed him the subpoena. During closing arguments, Ms. Berthelot stated:
I came into court and I gave him [Marks] a subpoena.... Come to court and tell us what you know. But you hear when he goes downstairs and he says I talked to Will. I asked Will was it your attorney or was it the State because I [Berthelot] actually didn’t talk to him.... So he asks Will. Will, your attorney wants to subpoena me? Hell, no. My attorney doesn’t want to hear anything you have to say. He told me to tell you don’t fuck with that. Don’t go.
As the record reflects, defense counsel repeatedly objected to the prosecutor’s comments and questions. The trial court sustained the defense’s objections and gave a cautionary instruction to the jury. Defendant asserts the admonitions were inadequate given that the prosecutor deliberately gave the false impression that defense counsel had communicated to Marks, *703 through defendant, that he should not testify for the state. Regardless of the motive, defendant argues, the prosecutor’s comments and questioning undermined the defense and damaged defense counsel’s credibility, causing the jury to reject his arguments.
In State v. Brumfield, 96-2667 (La.10/20/98), 737 So.2d 660, the prosecutor argued during closing argument that “ ‘during the course of this trial those very police officers who go about and try to protect us every day have been assailed [on cross-examination by defense counsel], have been defamed through the allegations of this defendant when he is the person who is on trial.’ ” Id. at p. 9, 737 So.2d at 666. The Louisiana Supreme Court found that the prosecutor’s argument was not improper, finding that although the State should refrain from making personal attacks on defense strategy and counsel, “the prosecutor’s statement about defense Iscounsel’s cross-examination of police officers was a fair comment pointing out the frequently used strategy of attempting to shift the focus from the accused to the accuser.” Id.
In State v. Tassin, 11-1144 (La.App. 5 Cir. 12/19/13),129 So.3d 1235, the court stated:
The touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor. Consequently, the aim of due process is not punishment of society for the misdeeds of the prosecutor but avoidance of an unfair trial to the accused. Smith v. Phillips, 455 U.S. 209, 219, 102 S.Ct. 940, 947, 71 L.Ed.2d 78 (1982); State v. Ortiz, 11-2799 (La.1/29/13), 110 So.3d 1029, 1034, cert. denied, — U.S. -, 134 S.Ct. 174, 187 L.Ed.2d 42 (2013). While a prosecutor should prosecute with “earnestness and vigor” and “may strike hard blows, he is not at liberty to strike foul ones.” Berger v. United States 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314 (1935).
Tassin, 11-1144, pp. 19-20, 129 So.3d at 1249.
In Tassin, defendant argued that his rights to counsel, due process, and a fair trial were violated when the prosecutor attacked defense counsel’s integrity and denigrated the defense throughout trial. The defendant argued that the trial court erred by overruling the defense objections, refusing to give a remedial instruction, and denying requests for a mistrial. The appellate court noted that the prosecutor’s conduct during the trial went beyond the bounds of “earnestness and vigor,” and that the prosecutor, at times, clearly made inappropriate and unprofessional comments. However, the court found that the comments and unprofessional conduct of the prosecutor did not affect the fairness of defendant’s trial and therefore did not require the reversal of defendant’s conviction. Id. The court reached this conclusion, citing United States v. Jones, 839 F.2d 1041, 1049-50 (5th Cir.1988), a case in which the prosecutor had accused defense counsel of suborning perjury. In considering whether this amounted to reversible error, the \ Jones court considered three factors: the magnitude of the prejudicial effect of the statement, the efficacy of any cautionary instructions, and the strength of the evidence of the defendant’s guilt. The Jones court determined that the prosecutor’s comment, “ ‘while it no doubt impugned the integrity of [defense counsel], had little chance of affecting the determination of guilt.’ ” Tassin, 11-1144, p. 22, 129 So.3d at 1250-1251.
In United States v. Murrah, 888 F.2d 24 (5th Cir.1989), a case cited by defendant, the United States Fifth Circuit Court of Appeal considered serious com *704 plaints of prosecutorial misconduct focusing on comments made by the prosecutor in opening statements and closing argument. “The comments involved two discrete matters: evidence which was discussed but not produced, and charges the defendant and/or his counsel hid a witness.” Id. at 25. The Court stated that the trial court in response to the prosecutor’s improper remarks “opted to rectify this improper comment by merely reminding the jury to ‘recall what the evidence was in the case.’... In such a setting the court should have provided more effective instructions to offset the prosecutor’s comments ....” Id. at 26. The Court proceeded to apply the three factors analysis performed by the courts in Jones and Tassin: “the magnitude of the prejudicial effect, the efficacy of the cautionary instructions, and the strength of the evidence of defendant’s guilt.” Id. at 28. The Court found that due to the circumstantial nature of the case and the pervasiveness of the improper conduct by the prosecutor, the trial court’s instructions did not neutralize the damaging effect of the remarks. Id. at 26. The Court found the remarks tainted the trial, reversed the conviction, and remanded the case. Id. at 28.
The Murrah case is distinguishable from the present case because the complained of conduct was pervasive throughout the trial. Here, the objectionable |10remarks by the prosecutor occurred during Marks’ testimony and his attempt to recant his earlier statement. The trial court sustained all of the defense counsel’s objections and instructed the jury that defendant’s counsel did nothing wrong. In addition, contrary to defendant’s assertions, the state presented substantial evidence at trial from which the jury could have found the defendant guilty. Detective Hurst testified that the videos from both the bar and a neighbor down the street captured the murder and defendant fleeing the scene. Lawrence identified the victim and defendant in the bar video and related it to his personal observation from that night. Furthermore, defendant has failed to show how he was prejudiced by the statements of the prosecutor. Thus, the verdict was not attributable to the prosecutor’s statements. This assignment of error is merit-less.
In the second assignment of error, defendant contends the trial court violated his right to a fair trial by allowing the jury to take the transcript of a witness’s statement into the jury room during deliberations.
During deliberations, the jury sent a note to the trial court requesting to see the statement of Mitchell Marks. The trial court agreed to send the transcript of the statement to the jury. Defendant objected. The trial court reasoned that under La.C.Cr.P. art. 793(A) it would have been permissible to replay the audio of Marks’s statement to the jury during deliberation, but that it was easier to allow them to read the statement rather than deal with the technical difficulties of the recorder.
Article 793(A) of the Louisiana Code of Criminal Procedure provides:
Except as provided in Paragraph B of this Article, a juror must rely upon his memory in reaching a verdict. He shall not be permitted to refer to notes or to have access to any written evidence. Testimony shall not be repeated to the jury. Upon the request of a juror and in the discretion of the court, the jury may take with it or have sent to it any object or document received in evidence when a physical examination thereof is required to enable the jury to arrive at a verdict.
InThe Louisiana Supreme Court has held that it is permissible for the jury to view videotapes properly admitted into evi *705 dence during deliberation. State v. Brooks, 2001-0785, p. 5 (La.1/14/03), 838 So.2d 725, 729. The Court reasoned that videotapes of crimes as they happen are neither testimony nor written evidence. Id. at p. 3, 838 So.2d at 727. However, as this Court stated in State v. Johnson, 97-1519 (La.App. 4 Cir. 1/27/99) 726 So.2d 1126:
Louisiana courts have reversed many convictions where the jury viewed a defendant’s confession or written statement or reexamined verbal testimony during deliberations. State v. Adams, 550 So.2d 595 (La.1989) (jury reviewed defendant’s confession to police); State v. Perkins, supra [423 So.2d 1103 (La.1982) ] (conviction for first degree murder reversed based on a Brady violation and because during deliberations the jury examined the defendant’s written statement); State v. Buras, 459 So.2d 756 (La.App. 4th Cir.1984) (aggravated kidnapping reversed because during deliberations the jury was given a transcript of recorded telephone calls between the kidnappers and the victim’s family); State v. Gracia, 527 So.2d 488 (La.App. 5th Cir.1988) (jury reviewed the defendant’s written statements). Gracia noted that prejudice was presumed, quoting State v. Freetime, 303 So.2d at 489.
Johnson, 97-1519, p. 13, 726 So.2d at 1133.
The evidence provided to the jury in Johnson consisted of medical records with written notations. This Court concluded that the trial court erred by allowing the jury access to the written evidence during deliberation. In light of the cases cited above and this Court’s ruling in Johnson, we find that the trial court erred in allowing the jury to review the transcribed statement of Marks.
However, as this Court stated in Johnson, citing State v. [Saul] Johnson, 541 So.2d 818, (La.1989), such errors may not necessitate reversal. This Court stated:
Under La.C.Cr.P. art. 921, an appellate court shall not reverse a judgment because of any error “which does not affect substantial rights of the accused.” Whether substantial rights of the accused were violated is determined under federal harmless error standards, i.e., whether the guilty verdict in this trial was surely unattributable to the error. State v. [Silas] Johnson, 94-1379, p. 14 (La.11/27/95), 664 So.2d 94, 100, citing Sullivan v. Louisiana, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993). [Silas] Johnson distinguished between “trial errors,” which may be reviewed for harmless error, and “structural errors,” which defy analysis under the harmless error doctrine. Johnson at p. 14, 664 So.2d at 100, citing Arizona v. Fulminante, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991).
The Court [in Silas Johnson ] stated that trial error is error which occurs during presentation of the case to the trier of fact and may be quantitatively assessed in the context of the other evidence. The Court further explained:
A structural error is one which affects the framework within which the trial proceeds.... Structural defects include the complete denial of counsel ...; adjudication by a biased judge....; exclusion of members of defendant’s race from a grand jury ...; the right to self-representation at trial ...; the right to a public trial ...; and the right to a jury verdict of guilt beyond a reasonable doubt.... Id., at pp. 14-15, 664 So.2d at 101 [citations omitted].
We conclude based on these cases that, although Art. 793’s prohibition is explicit, violation of that article does not mandate reversal. Rather, the er *706 roneous presentation of written, documentary evidence to the jury during deliberations is trial error that can be quantitatively assessed in the context of other evidence, and therefore is subject to harmless error analysis.
Johnson, 97-1519, p. 16, 726 So.2d at 1134.
A review of the record indicates that the evidence of defendant’s guilt was substantial. Detective Hurst’s testimony was largely based on numerous angles of video camera footage that clearly depicted the crime. Lawrence was familiar with the parties involved and used this footage to identify them as well. The transcript of Marks’ statement only supplemented Lawrence’s identification of “Will” as the shooter to Detective Williams shortly after the crime. Derrick Lotz, defendant’s friend, identified defendant as the shooter from a six-person photographic lineup within twenty-four hours of the crime. Marks’ statement to Detective Darling was very specific and detailed, including, the fact that defendant had a gun that was “[bjetween a 9[-] and a 40” caliber. This description matches the 40-caliber shell | iacasings that a Friar Tucks employee found at the crime scene. Furthermore, Pelfrey’s testimony was also detailed.
The evidence of defendant’s guilt is extensive. Under the harmless error analysis, any harm that may have resulted from the jury’s access to the transcript of Marks’ statement was harmless, as it did not contribute to the verdict, and did not deprive defendant of a fair trial. This claim has no merit. ,
Accordingly, for the reasons stated above, defendant’s conviction and sentence are affirmed.
AFFIRMED

. La. R.S. 14:30.1.