IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT


_____

No. 90-8739
_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

FILEMON SOTELO SANCHEZ,
JOSE ANGEL NAEGELE, and
REBECA PORTILLO BRITO,

Defendants-Appellants.


_____

No. 91-8023
_____


UNITED STATES OF AMERICA,

Plaintiff-Appellant,

versus

RICARDO PORTILLO BRITO,

Defendant-Appellee.


_____

Appeals from the United States District Court
for the Western District of Texas
_____



Before  POLITZ, Chief Judge, REYNALDO G. GARZA and WIENER,
Circuit Judges:

GARZA, REYNALDO G., Circuit Judge:

1

This is a consolidated appeal from a rather large marijuana conspiracy trial. Appellants Rebeca Portillo Brito (Rebeca), Filemon Sotelo Sanchez (Filemon), and Jose Angel Naegele (Naegele), and appellee Ricardo Portillo Brito (Ricardo)[1], were all named in a 27 count indictment alleging, *inter alia*, violations of 21 U.S.C. §§ 841(a)(1) and 846, possession with intent to distribute and conspiracy to possess with intent to distribute more than 100 kilograms of marijuana, and 21 U.S.C. § 843, use of a telephone to facilitate the commission of a felony. After a jury trial, Filemon was convicted of the conspiracy, possession and telephone counts and Naegele, Rebeca and Ricardo were each convicted of one conspiracy count.[2] Ricardo's post-verdict motion for acquittal was granted by the district court. Filemon, Rebeca and Naegele all appeal their convictions, while the United States appeals the post-verdict judgment of acquittal granted to Ricardo.

## I. FACTS

---

[1] Appellee Ricardo Portillo Brito is the brother of appellant Rebeca Portillo Brito.

[2] Naegele was named only as a defendant in Count One of the indictment, the central conspiracy count, while Rebeca and Ricardo were named in Count One as well as Count Twenty-Seven, an illegal use of the telephone count. The district court granted a judgment of acquittal as to Count Twenty-Seven, finding that because the conversation occurred *after* the overt acts of the conspiracy, it was not a conversation *in furtherance of* the conspiracy.

2

On December 7, 1988, Naegele was arrested in New Mexico as he drove a pickup laden with approximately 100 pounds of marijuana. Accompanying Naegele was Juan Aron Sotelo Sanchez (Juan), a named co-conspirator and brother of Filemon, who drove a Pontiac Fiero with a CB radio identical to that in Naegele's truck and tuned to the same channel.[3] Naegele told police he had transported marijuana on one other occasion. He stated he had known Juan Sanchez for three months. Naegele pled guilty to state charges under New Mexico law; charges were never formally brought against Juan.

On June 1, 1989, Border Patrol agents at the Sierra Blanca check point near El Paso, Texas, found 94 pounds of marijuana in a pickup truck they had pulled over for secondary inspection. The name "Juan Sanchez" was found next to two phone numbers, one for "Sanchez Brothers Builders, Inc." at 492 Mockingbird, the El Paso residence of Filemon, and the other for the El Paso residence of Rebeca and her common law husband Juan Aron Sotelo Sanchez.

Wiretaps of the two phones were authorized. During the 60 days the phones were tapped, the FBI intercepted

---

[3]     Juan Sanchez was named in the 27 count indictment along with the appellants and appellee in this appeal. His separate convictions for conspiracy and illegal use of the telephone were challenged in this court on sufficiency of the evidence grounds. In an unpublished opinion on the summary calendar, a panel of this court affirmed his convictions. *See United States v. Juan Sotelo Sanchez*, 953 F.2d 642 (5th Cir. 1992) (unpublished).

approximately 5000 phone calls.[4]  Numerous calls concerned

conversations in which elaborate codes were used to conceal

drug related matters.  Rebeca was recorded making plane

reservations for her husband Juan and co-defendant Rafael

Ramirez Valdez (Ramirez), for a trip to Midland-Odessa in

Texas.  Named co-conspirator Bivian Madrid Villalobos phoned

Juan at his residence and discussed a marijuana deal in

code.  Filemon, two days after the Villalobos conversation

with Juan, spoke with the Flores brothers[5] in Dallas and

stated he had "340 wooden boards."  Two days later, the

Flores brothers arrived in El Paso.  The day after their

arrival, a pinata[6] party was held for the child of Rebeca

and Juan.  Numerous defendants were present at the party as

well as friends and family members of Rebeca and Juan.[7]  On

September 11, 1989, the day after the party, Ivan Flores was

arrested outside El Paso on Interstate Highway 10.  He was

---

[4]     This figure includes wrong numbers and busy signals.

[5]     The Flores brothers, Ivan and Abel, were named co-conspirators who resided in Dallas, Texas.

[6]     A pinata is a decorated clay jar filled with candy and struck with a stick by children to release the candy.  It is a traditional aspect of Mexican celebrations of childrens' birthdays and is common at Christmas. *See* Webster's Third New International Dictionary 1717 (3rd ed. 1981).

[7]     The record indicates witnesses for the government admitted they had no knowledge that any drug related activities were discussed at the pinata party.

driving a semi-truck with trailer, the gas tank of which was found to contain 330.5 pounds of marijuana. Intercepted phone calls involving Filemon and Juan indicated their extensive knowledge of and participation in this particular seized shipment. Inside the driver's wallet was found a business card for Sanchez Brothers Builders, Inc., with the same phone number on it, and another card with the name "Chico"[8] and the notation "Home 858-8528", the home phone of Rebeca and Juan. The day after this seizure, a coded phone conversation between Ramirez and Juan relating the fact of the bust was intercepted. Later the same day, a conversation between Rebeca and her brother, Ricardo, was intercepted in which Rebeca related the facts of the Flores brothers' bust and in which both she and Ricardo expressed remorse and concern over the seizure.[9]

Six days after this last phone call, the FBI intercepted a call from Ramirez to Juan in which a 10 pound load of marijuana was discussed. The next day, the Border Patrol at the Sierra Blanca checkpoint intercepted a car with 10 pounds of marijuana in the gas tank.

## II. DISCUSSION

A. FILEMON SOTELO SANCHEZ

---

[8] "Chico" was an alias determined to belong to Juan Aron Sotelo Sanchez.

[9] The fact that this conversation concerned the marijuana seizure involving the Flores brother was admitted to by Rebeca.

1.   *Sufficiency of the Evidence*

In his first point of error, Filemon contends the evidence was insufficient to support his convictions.  He claims the government failed to establish that he joined the conspiracy, had knowledge of the conspiracy, and that he voluntarily participated in the conspiracy.  The sole basis of this claim is that the testimony of the government's main witness, F.B.I. case agent William J. May (agent May), as to the meaning of certain code words could just as easily have been disbelieved as believed by the jury.  Because the testimony of agent May was the sole inculpatory evidence against Filemon, its susceptibility to equally different interpretations requires the reversal of the possession and telephone use convictions as well.

The well established standard in this circuit for reviewing a conviction allegedly based on insufficient evidence is whether a reasonable jury could find that the evidence establishes the guilt of the defendant beyond a reasonable doubt. *United States v. Gonzales*, 886 F.2d 781, 783 (5th Cir.), *cert. denied*, 490 U.s. 1093 (1989).  The evidence adduced at trial, whether it be direct or circumstantial, together with all inferences reasonably drawn from it, is viewed in the light most favorable to the verdict. *United States v. Pigrum*, 922 F.2d 249, 253 (5th Cir.), *cert. denied*, 111 S.Ct. 2064 (1991).  The assessment of the weight of the evidence and the determination of the credibility of the witnesses is solely within the province

6

of the jury. *United States v. Martin*, 790 F.2d 1215, 1219 (5th Cir.), *cert. denied*, 479 U.S. 868 (1986). If the "evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence of the crime charged," this court must reverse the convictions. *Clark v. Procunier*, 755 F.2d 394, 396 (5th Cir. 1985) (*quoting Cosby v. Jones*, 682 F.2d 1373, 1383 (11th Cir. 1982) (*as quoted in United States v. Fortenberry*, 919 F.2d 923, 926 (5th Cir. 1990)). This is so because, as was observed by the late Judge Alvin B. Rubin, where an equal or nearly equal theory of guilt and a theory of innocence is supported by the evidence viewed in the light most favorable to the verdict, "a reasonable jury *must necessarily entertain* a reasonable doubt. *Id*. (*quoting Cosby* at *id*.). With the scope of our review thus defined, we proceed to the merits of Filemon's claims on appeal.

To establish guilt of a drug conspiracy, it must be proven that an agreement with intent to distribute existed, that the defendant had knowledge of the agreement, and that the defendant voluntarily participated in the conspiracy. *United Sates v. Lewis*, 902 F.2d 1176, 1180 (5th Cir. 1990). An agreement may be inferred from concert of action, participation from a "collocation of circumstances," and knowledge from surrounding circumstances. *United States v. Espinoza-Seanez*, 862 F.2d 526, 537 (5th Cir. 1988). Mere presence at the scene and close association with those

7

involved are insufficient factors alone; nevertheless, they are *relevant* factors for the jury. *United States v. Simmons*, 918 F.2d 476, 484 (5th Cir. 1990).

The United States introduced into evidence several taped phone conversations involving Filemon and other named co-conspirators. The substance of the conversations and the meaning thereof was elaborated upon by agent May. Agent May testified that Filemon's use of certain terminology, in the context of the conversations, demonstrated Filemon's role as a principal in a large marijuana conspiracy. This testimony was predicated on agent May's characterization of specific terminology as coded terminology. These coded terms, testified agent May, represented variously marijuana, methods of transportation, the receipt of large quantities of marijuana and money to be paid for marijuana. For example, the government introduced a phone conversation between Filemon and named co-conspirator Abel Flores, intercepted on September 7, 1989. During the conversation, Filemon informs Abel Flores "I've got 340 wooden boards." Two hours later, another phone conversation was intercepted between Filemon and named co-conspirator Victor Manuel Ramirez (Victor). This conversation, in part, was as follows:

> Filemon: ...pick up [a van] because I am going to need it. It already rained...it already rained on me.
>
> Victor: Already?

Filemon:  Yes, a lot.

Victor:  That's good.

Filemon:  A lot.

Victor:  Don't leave me out.

Filemon:  No.

Victor:  OK.

Filemon:  Three forty...

Victor:  Uyyy.

Filemon:  ...fell on me.

Victor:  Yeah?

Filemon:  Yeah.

Victor:  That's good.  And it is already here?

Filemon:  Already...I already have it in my hands.

On September 9, 1989, two days after Filemon's conversation with Victor, Ivan Flores phoned Juan to inform Juan that Ivan and his brother, Abel Flores, were in El Paso at the Comfort Inn.  Later that same day, Ivan Flores phoned Filemon to inform him of the presence of the Flores brothers at the Comfort Inn.  On September 11, 1989, Ivan Flores was arrested at the Sierra Blanca checkpoint driving a semi-truck laden with 330.5 pounds of marijuana.  On September 14, 1989, Filemon spoke with Ivan Flores' father who had called Filemon to seek assistance in the selection of an attorney for Ivan.  During this conversation, Filemon mentioned that Ivan Flores was with Filemon in El Paso. That same day, a conversation between Filemon and an

unidentified woman named Omega[10] revealed Filemon's frustration with the arrest of Ivan Flores at the "mountain" and his surprise that the Border Patrol agents appeared to have been waiting for him.  This conversation, in part, was as follows:

> Filemon:  A really bad incident (percance) that happened to us, "PRIMA."
>
> Omega:  Yeah.  Oh, my God.
>
> Filemon:  Yes, can you believe that?  What I sent over there....
>
> Omega:  Eh?
>
> Filemon:  ...what I sent over there.
>
> Omega:  Uh huh.
>
> Filemon:  ...to hell.
>
> Omega:  Oh, my God.
>
> .....
>
> Filemon:  And the worst part of it is that they were already waiting for him.
>
> .....
>
> Omega:  And was it when he was just leaving?
>
> Filemon:  No, over there in ... in uh... you know where.
>
> Omega:  Yeah?
>
> Filemon:  Over there on the mountain.

---

[10]     Omega was also referred to by Filemon as "Prima", the Spanish word for "cousin".  *See* Vox Compact Spanish and English Dictionary 200 (Softcover ed. 1989)

Filemon appears to argue that because he was involved in the construction business, the reference to "340 wooden boards" was just that, a reference to 340 actual wooden boards. Agent May testified that Filemon's use of the phrase "340 wooden boards" was a reference to 340 pounds of marijuana. Additionally, he testified that Filemon's use of the phrase "it rained on me" was a reference to the receipt of marijuana and that the phrase "three forty...fell on me" was a further reference to receipt of the specific amount of 340 pounds of marijuana. Further evidence, as noted above, disclosed the seizure of 330.5 pounds of marijuana being transported by Ivan Flores. Government witnesses testified that it is not uncommon for amounts of marijuana to vary by as much as 10-20 pounds, thus explaining the discrepancy of the weight of the marijuana actually seized from that discussed in the Filemon/Victor phone conversation of September 7, 1989.[11] Moreover, the "Sanchez Brother's

---

[11] At oral argument, it was brought to our attention that the weight of the marijuana seized on September 11, 1989, when finally weighed by government chemists, was actually 285 pounds. This is indeed supported by the record. Appellants in this case suggested that this discrepancy tended to undermine the credibility of agent May's assertion that the reference to "340 wooden boards" was a code for 340 pounds of marijuana. Additional testimony as to the weight of the marijuana, however, indicated that as much as a 10 pound discrepancy could be attributable to the drying of the marijuana and a discrepancy of between 10 to 20 pounds of weight was attributable to the packaging of the marijuana. These amounts, coupled with the testimony regarding the frequent variations in weights of shipments of between 10 to 20 pounds, provided the jury with more than an adequate basis to accept agent May's interpretation of the phraseology.

11

Builders. Inc., F. S. Sanchez, President" business card was found in Ivan Flores wallet. The term "mountain" was identified as a term commonly used to describe the area where the Sierra Blanca checkpoint was located. Finally, testimony at trial revealed that the semi-trailer pulled by the truck driven by Ivan Flores was a refrigerator trailer, not the type of trailer normally used for the transportation of construction materials; no evidence of the presence of any construction materials on the trailer was presented at trial.

We find the above recited facts would permit a reasonable jury to find Filemon guilty beyond a reasonable doubt of the conspiracy charges against him. It appears the jury in this case simply chose to believe the testimony of agent May. Moreover, the opposing theory of innocence put forth on appeal by Filemon does not fall into the realm of what an appellate court could reasonably conclude is a theory of innocence equally or nearly equally supported by the evidence as the theory of guilt. Because agent May's testimony regarding the code words was believed by the jury, Filemon's challenge to the conviction for the violation of 21 U.S.C. §843, illegal use of the telephone, must also fail. In addition, his challenge to the possession charge lacks merit because the essential elements thereof were proven at trial. The necessary elements to sustain a conviction for possession of marijuana with intent to distribute are that the defendant (1) knowingly (2)

12

possessed the marijuana (3) with intent to distribute it. *United States v. Villasenor*, 894 F.2d 1422, 1426 (5th Cir. 1990). Accepting agent May's testimony, the only colorable issues available to Filemon would be that of possession and intent to distribute. Possession may be constructive[12] if evidence indicates the defendant's ownership, dominion and control over the marijuana. *United States v. Richardson*, 848 F.2d 509, 512 (5th Cir. 1988). Here, the evidence shows Filemon's assertion that the marijuana belongs to him, either individually or as a member of the conspiracy. Intent to distribute is typically inferred from the fact that an amount is too large for any purpose other than distribution. *United States v. Romero-Reyna*, 867 F.2d 834, 836 (5th Cir. 1989). Again, here the amount was in excess of 300 pounds. The jury could easily have determined this amount was not for personal use and thus that Filemon intended to distribute it. Even were the issues of Filemon's constructive possession and intention to distribute not so clearly present, we would nevertheless affirm. A conspirator is liable for the substantive offenses of his co-conspirators while he is a member of the conspiracy. *United States v. Garcia*, 917 F.2d 1370, 1377 (5th Cir. 1990) (*quoting United States v. Basey*, 816 F.2d 980, 997 (5th Cir. 1987)); *See also United States v.*

---

[12] *United States v. Vergara*, 687 F.2d 57, 61 (5th Cir. 1982).

*Sullivan*, 578 F.2d 121, 122-23 (5th Cir. 1978) (once conspiracy and knowing participation therein established, conspirator deemed guilty of crimes committed in furtherance of conspiracy by other conspirators). Nothing in the record indicates that the guilt of Ivan Flores for the substantive offense of possession with intent to distribute or his membership in the conspiracy was ever questioned.

2. *Improper Prosecutorial Argument*

In his second point of error, Filemon suggests that allegedly improper prosecutorial argumentation requires reversal of his convictions. In closing argument, the prosecutor argued to the jury:

> No, there is another attack by Mr. Ramos [Filemon's defense counsel] on the big bad Government, the agent, the FBI agent. Well, ladies and gentlemen, you are the sole judges of the credibility of the witnesses here. If you think Bill May is a liar, then you go ahead and cut all those people loose. Okay?

This argumentation was objected to by defense counsel and the trial court sustained the objection. The record indicates counsel did not request that the district court give a curative instruction to the jury.

Courts will not lightly reverse a criminal conviction on the basis of a prosecutor's arguments standing alone. *United States v. Young*, 470 U.S. 1, 9 (1985). Reversible error will result only where it is shown that the jury argument is both improper and harmful. *United States v. Iredia*, 866 F. 2d 114, 117 (5th Cir.), *cert. denied* 492 U.S.

14

921 (1989) (*citing United States v. Lowenberg*, 853 F.2d 295, 301 (5th Cir. 1988)).  "The determinative question is whether the prosecutor's remarks cast serious doubt on the correctness of the jury's verdict."  *Id*. (*citing United States v. Jones*, 839 F.2d 1041, 1049 (5th Cir. 1988)).  The test that is employed in this circuit requires us to consider "1) the magnitude of the prejudicial effect of the statements; 2) the efficacy of any cautionary instruction; and 3) the strength of the evidence of the defendant's guilt." *Id*. (*citing Lowenberg*, 853 F.2d at 302).

We cannot say, viewing the record as a whole, that the comments of the prosecutor in this case were "so pronounced and persistent that [they] permeate[d] the entire atmosphere of the trial." *Iredia*, 866 F.2d at 117 (*quoting United States v. Williams*, 809 F.2d 1072, 1096 (5th Cir.), *rev'd on other grounds*, 828 F.2d 1, *cert. denied*, 108 S.Ct. 228 (1987)).  Thus, the argument did not carry the magnitude of prejudicial effect necessary for the first element of the test to weigh in Filemon's favor.  As to the second element of the test, it is clear there was no curative instruction given by the district court.  It is also clear, however, that none was requested.  Thus, the second element of our test weighs neither in favor of nor against Filemon. Finally, as we have extensively related, there was more than adequate evidence of Filemon's guilt and thus, the third element of the test weighs against him.  Having conducted our analysis, we conclude Filemon has failed to demonstrate

15

the requisite inappropriateness and harm necessary for reversal of his conviction solely on the grounds of improper prosecutorial commentary.


B.  JOSE ANGEL NAEGELE

In his sole point of error, Naegele asserts the district court erred in finding sufficient evidence existed to support his conviction because there is a fatal variance between the indictment and the proof adduced at trial. Naegele does not contend the evidence is insufficient to establish any one or more of the elements necessary to prove the conspiracy.  Rather, he contends the government proved the existence of multiple conspiracies while the indictment alleged only a single conspiracy.  He asserts that his membership in a single conspiracy is undermined because 1) there is a six month lapse in time between his arrest in New Mexico in 1988 and the next seizure of drugs at the Sierra Blanca checkpoint in 1989, 2) the alleged acts of the conspiracy took place in different states, and 3)  there is no evidence of his continued participation in the conspiracy after his arrest in 1988.  Naegele candidly recognizes that a single conspiracy is not transformed into multiple conspiracies simply by lapse of time, change in membership, or change in geographical emphasis.[13] *United States v. De*

---

[13]     Naegele's candid presentation is refreshing; his brief is well written and concise.  Unfortunately, it would appear that no amount of legal reasoning could save the day for Naegele as the

*Varona*, 872 F. 2d 114, 119 (5th Cir. 1989).

Were the principles of conspiracy law not weighed so heavily in favor of the affirmance of Naegele's conviction, we would be inclined to reject his contention nevertheless. In order for Naegele to succeed on his variance theory, he must demonstrate that his substantial rights have been prejudiced. *United States v. Guerra-Marez*, 928 F.2d 665, 671 (5th Cir.), cert. denied, 112 S.Ct. 322 and 112 S.Ct. 443 (1991) (*quoting United States v. Richardson*, 883 F.2d 1147, 1154-55 (5th Cir. 1987)).  It is by now a well established principle in this circuit that if the government proves the existence of multiple conspiracies "and the defendant's involvement in at least one of them, then clearly there is no variance affecting the defendant's substantial rights." *Id*. at 671-72 (*quoting United States v. L'Hoste*, 609 F.2d 796, 801 (5th Cir.), *cert. denied*, 449 U.S. 833 (1980)); *United States v. Martino*, 648 F.2d 367, 382 (5th Cir. 1981), *cert. denied*, 456 U.S. 943 (1982) (*citations omitted*).

Viewing the evidence in the light most favorable to the verdict and assuming *arguendo* multiple conspiracies were proven by the evidence, Naegele's participation in at least one conspiracy is amply supported.  Testimony of the arresting officers in New Mexico indicated Naegele stated he was operating with Juan Aron Sotelo Sanchez and had done so

---

record bears out that the facts of his conviction are insufficient for reversal under the principles of conspiracy law as enunciated by this circuit.

17

before on at least one occasion.[14]  Both individuals had identical C.B. radios in their vehicles and both radios were tuned to the same channel.  A substantial part of the approximately 100 pounds of marijuana seized from Naegele's truck was in plain view in the passenger compartment and it was Naegele's own statements regarding the location of the remainder of the haul that led the New Mexico officers to remove it from concealed compartments in the truck.  Moreover, Naegele informed the New Mexico authorities that Juan Sanchez had placed the marijuana in the pickup in the country of Mexico, that he met Juan Sanchez north of the U.S.-Mexico border, and that he had driven the truck from that point until the time of the arrest.  With these facts in evidence, Naegele's rights were not substantially prejudiced even if there is a variance because these facts are sufficient to support a finding that Naegele was guilty of at least one conspiracy involving himself and Juan Sanchez.

C.  REBECA PORTILLO BRITO

     1)  *Sufficiency of the Evidence*

     Rebeca argues there was insufficient evidence to

---

[14]     Naegele gave authorities in New Mexico at least two different versions of his activities, one tending to be exculpatory and the other inculpatory.  Because our standard of review requires us to view the evidence in the light most favorable to the verdict, we accept, as apparently did the jury, the version of Naegele's story tending to show his involvement in the conspiracy.

convict her as a co-conspirator. As indicated earlier, Rebeca does not challenge her knowledge of the existence of the conspiracy. This knowledge is plainly indicated from an intercepted call between Rebeca and her brother, Ricardo, placed the day after the arrest of Ivan Flores. Although the district court ruled the conversation did not support the substantive offense of use of a telephone in furtherance of a conspiracy,[15] the conversation was admissible as relevant to Rebeca's role in the conspiracy.[16] In the conversation, Rebeca discussed the arrest of Ivan Flores and expressed dismay and sadness over the loss of the "system", later identified at trial as a code word for the method of transporting the marijuana. Significantly, agent May agreed with the characterization of Ms. Kurita, Rebeca's defense counsel, that the conversation was nothing more than "two individuals [] lamenting or discussing the occurrences of the day before...." Record on Appeal, Vol. V, p. 405. Were this the only evidence the jury could consider regarding

---

[15] The district court made this ruling because the conversation occurred *after* the substantive acts constituting the conspiracy had transpired. The government has not challenged this decision on appeal.

[16] Rebeca contends the district court erred in admitting the conversation because it was inadmissible hearsay. This contention is without merit. *See United States v. Jones*, 839 F.2d 1041, 1051-52 (5th Cir.), *cert. denied*, 486 U.S. 1024 (1988).(recorded telephone conversation between two defendants not hearsay in conspiracy trial where used to show awareness of, and participation in, conspiracy).

Rebeca's status as a co-conspirator, we would be loathe to affirm her conviction.  Indeed, we are somewhat skeptical of the remaining evidence against her but find, after careful review, that it is sufficient to permit a reasonable jury to reach a verdict of guilty.

At the trial, the government introduced two intercepted conversations of Rebeca making plane reservations for her husband Juan, the principal conspirator, and named co-conspirator Rafael Ramirez Valdez.  In both conversations, reservations were made for each individual on the same flight to Midland, Texas.  Furthermore, in the conversation regarding reservations for Ramirez, Rebeca used an alias, "Anna", to conceal her true identity.  Testimony later revealed the trip to Midland by Juan and Ramirez entailed a rather lengthy visit with an unknown individual driving a vehicle registered to named co-conspirator Bivian Villalobos.  The jury could infer from these facts, coupled with the facts of Rebeca's knowledge of the conspiracy and the fact that she lived in the same home with the principal conspirator, Juan Sanchez, that her phone calls to Southwest Airlines were voluntary acts on her part in furtherance of the conspiracy.  While we find this evidence to be far from the quantity of evidence against Filemon and other conspirators in this case, we conclude it is sufficient to permit the jury to have reached its decision.

2.  *Wiretap Minimization*

In her second point of error, Rebeca argues the

government violated 18 U.S.C. § 2501 et seq., which requires the government to minimize its wiretapping activities. The statute requires the government to make reasonable efforts to reduce the possibility of intercepting non-criminally related phone conversations.

At trial, counsel for appellant argued that because all of the named interceptees in the wiretapping order were male, the government should have ceased listening to the conversation as soon as it realized appellant was a female. This position is untenable. The court order authorizing the interception of the calls indicated that the named individuals as well as others not named were the basis for the request. Those not named in the order included persons who, through the interception of calls involving named individuals, were determined to be part of the conspiracy.

In addition, this case is replete with the use of coded drug terminology. Where drug jargon is used over the phone, the government may engage in more extensive wiretapping and the interception of innocent calls may be a more reasonable activity. *United States v. Macklin*, 902 F.2d 1320, 1328 (8th Cir. 1990), *cert. denied*, 111 S.Ct. 689 (1991). In *Macklin*, the Eighth Circuit recognized that the government essentially can listen long enough to determine the call is not relevant to the investigation. *See id*. (government must limit calls to pertinent investigation *as much as possible*). Here, government witnesses testified that calls were initially listened to in order to determine the scope of the

21

conspiracy.  Upon reaching the conclusion that a particular call did not or would not lead to information pertaining to the scope of the conspiracy, the interception ceased.  This testimony, combined with Rebeca's use of code words, leads us to conclude her second point of error is without merit.

   3.   *Ineffective Assistance of Counsel*

   In her third and final point of error, Rebeca argues her conviction must be overturned because her counsel was ineffective at trial.  She contends that her counsel failed to file any pre-trial motions, failed to file a written motion to suppress the recorded conversations pursuant to the wiretapping statute, failed to limit the evidence of the recorded conversation with her brother, failed to request the identity of the confidential FBI informants who allegedly could have provided her with exculpatory testimony, and failed to subpoena the same informants.

   We do not reach the merits of this point of error and express no opinion thereon.  An appellant's failure to present the issue of ineffective assistance of counsel in the district court precludes our review. *United States v. Higdon*, 832 F.2d 312, 314 (5th Cir. 1987), *cert. denied*, 484 U.S. 1075 (1988) (general rule is that  claim of ineffective assistance of counsel should not be heard on direct appeal where claim not first raised in district court).  Because Rebeca did not raise the claim below, we decline to hear the

22

issue, but do so without impairing her future rights.[17]

D.  RICARDO PORTILLO BRITO

After the jury returned a verdict of guilty against Ricardo, he moved for a post-verdict judgment of acquittal. The district court granted the motion, reasoning that although the evidence demonstrated Ricardo's knowledge of the conspiracy, it was insufficient to establish beyond a reasonable doubt that he intended to join or participate in the conspiracy.  In the words of Judge Hudspeth, "It is possible that Ricardo Portillo Brito participated in the conspiracy, but it is equally possible that he was merely a knowing spectator.  Considered as a whole, the evidence fails to establish beyond a reasonable doubt that he was the former rather than the latter."

The duty of a district court in ruling on a post-verdict motion for acquittal is to determine, viewing the evidence in the light most favorable to the government, whether the evidence could be accepted by a jury as adequate and sufficient to support the conclusion of the defendant's guilt beyond a reasonable doubt. *United States v. Varkonyi*,

---

[17]    Rebeca additionally argues that the trial court should have granted her a new trial based on the judgment of acquittal granted to her brother.  This issue is not briefed at all and thus has been abandoned. *See United States v. Lindell*, 881 F.2d 1313, 1325 (5th Cir. 1989), *cert. denied*, 110 S.Ct. 2621 (1990) (*citing* F.R.App.P. 28(a)(4)).  Even were this issue not abandoned, we would reject it for, after an exhaustive search of the record, we are unable to find any indication that Rebeca ever filed a motion for new trial.

611 F.2d 84, 85 (5th Cir.), *cert. denied*, 446 U.S. 945 (1980). An appellate court reviews the trial court's granting of a motion for acquittal *de novo*, applying the same standard as the court below. *Id*. at 85-6. A court may not simply substitute its own views of justice for those of the jury. *Id*. at 86. Finally, the jury alone can assess the weight of the evidence and the credibility of the witnesses. *United States v. Molinar-Apodaca*, 889 F.2d 1417, 1423 (5th Cir. 1989).

The sum of the evidence in this case is that Juan and Filemon Sanchez were the principals of a conspiracy. They lived in El Paso, Juan with his common law wife Rebeca. At all times, Ricardo lived in Austin. On September 10, 1989, Ricardo went to El Paso to attend his nephew's first birthday party, a party which was attended by roughly 30 people. In addition to family members and friends, several persons later identified as co-conspirators in this case attended the party. Ricardo was driven by his cousin (a student not implicated in any of the alleged wrongdoing involved in this case) to the El Paso airport in the early evening and he departed for Austin. He appeared at work in Austin on the morning of September 12, 1989, a Monday.

In the latter part of September 12, 1989, a phone call, discussed above, between Rebeca and Ricardo was intercepted in which the two discussed the arrest of Ivan Flores and commiserated over the same.

The United States contends the evidence is sufficient

24

to convict Ricardo.  It points to a reference to the City of Austin, along with references to other Texas cities, and reasons "Austin" was a code word for Ricardo.  It also suggests that because Ricardo travelled to his nephew's birthday party in El Paso, he can be viewed as having a close family relationship with his sister and thus the conspiracy.[18]  Finally, the government refers us to statements made in the Rebeca/Ricardo phone conversation.

Initially, we note that Ricardo readily admits to knowledge of the conspiracy.  We have additionally discussed agent May's agreement with the characterization of the Rebeca/Ricardo phone conversation.  Moreover, all of agent May's testimony regarding the allegedly incriminating aspects of the Rebeca/Ricardo conversation were directed at establishing the conversation as being in furtherance of the conspiracy.  The district court rejected this analysis when it granted a judgment of acquittal as to the illegal use of the telephone charges against Rebeca and Ricardo.  Thus, as discussed previously, the jury could have used the conversation only as evidence of knowledge of or participation in the conspiracy.  Again, however, agent May's testimony regarding statements in the conversation concerned acts in the future.  Specifically, agent May

---

[18]    This reasoning we find particularly disturbing.  No evidence suggests that Ricardo should have anything other than a close relationship with his sister who, as far as the record reflects, is his only sibling.

interpreted statements made by Rebeca as indicating that a shipment of marijuana *would be going to* Ricardo in Austin. Moreover, his interpretation of Ricardo's lamentations was that Ricardo *would not be able to* use the "system" in the future. As to the pinata party, testimony from government agents revealed that there was no basis upon which the jury could conclude that Ricardo participated in any conspiracy related activities while present. Quite simply, there was no evidence presented upon which a reasonable jury could conclude beyond a reasonable doubt that Ricardo participated in the conspiracy. Finally, we note the uncontroverted evidence that Ricardo has been employed as a supervisor of a sealant business in Austin for approximately four years, has an excellent work record, pays his bills regularly, and lives a modest life in a modest home. As to Ricardo, the evidence supports equally or nearly equally a theory of guilt as a theory of innocence.[19] *See Clark*, 755 F.2d at 396.

CONCLUSION

We have reviewed all of the contentions by the parties who appear in the posture of appellants in this case and deem them to be without merit. Therefore, finding no merit

---

[19] We observe, although our analysis does not turn upon, the fact that Judge Hudspeth, the district court judge in this case, has much more than his fair share of experience with the adjudication of criminal drug conspiracies, sitting as he does in El Paso in the Western District of Texas and on the border of Mexico.

to the complaints on appeal, the convictions of Filemon Sotelo Sanchez, Jose Angel Naegele and Rebeca Portillo Brito are in all respects AFFIRMED.  Additionally, the post-verdict judgment of acquittal granted as to appellee Ricardo Portillo Brito is in all respects AFFIRMED.