United States Court of Appeals
Fifth Circuit

**F I L E D**

**July 28, 2006**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 05-51744

Summary Calendar

_____

UNITED STATES OF AMERICA

Plaintiff - Appellee

v.

GLORIA SALAZAR-CASTANEDA

Defendant - Appellant

_____

Appeal from the United States District Court
for the Western District of Texas, El Paso
No. 3:05-CR-41

_____

Before KING, WIENER, and DEMOSS, Circuit Judges.

PER CURIAM:[*]

Defendant-appellant Gloria Salazar-Castaneda appeals from her conviction and sentence for importation of and possession with intent to distribute marijuana in violation of 21 U.S.C. §§ 952(a), 960(a)(1), and 841(a)(1), respectively. Salazar-Castaneda contends that the evidence was insufficient to

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

-1-

establish the requisite knowledge that her vehicle contained concealed illegal drugs.  For the following reasons, we AFFIRM.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

On December 12, 2004, Gloria Salazar-Castaneda ("Salazar-Castaneda") was arrested while attempting to cross the border from Mexico into the United States.  At the primary inspection point, United States Customs and Border Protection Officer Ronald Kraft ("Kraft") stopped Salazar-Castaneda in a white 1996 Chevrolet Cavalier.  Salazar-Castaneda allegedly told Kraft that she had been "belly dancing" in Juarez, Mexico, the previous night.  According to Kraft, Salazar claimed that the vehicle belonged to her and that she had owned it for approximately four months.  Kraft also noticed that Salazar-Castaneda's hands were shaking when he asked her to count the approximately $200 she had on her person at the time.

After tapping on the vehicle's quarter panels aroused his suspicion, Kraft used a portable density meter to investigate whether any illegal contraband was contained in the driver and passenger side panels.  When Kraft then asked Salazar-Castaneda to produce her resident alien card, he again noticed that her hands were shaking.  A subsequent canine inspection of the vehicle revealed approximately 78.35 pounds of marijuana concealed behind the back seat, within the rear quarter panels, and behind the cold air intake below the windshield wipers.

During the canine inspection of her vehicle, Salazar-Castaneda was questioned further by Customs and Border Protection Officer Eric Hannemann ("Hannemann") at the secondary inspection station. Salazar-Castaneda declared that she was not bringing anything into the United States from Mexico. She also told Hannemann that she had owned the car for two to three months but that it was registered to a woman named Monica.[1] After seizure of the marijuana concealed within the vehicle, Immigration and Customs Enforcement Special Agent Francisco Garcia ("Garcia") informed Salazar-Castaneda of her <u>Miranda</u> rights and presented her with a written advisement, which she signed to indicate her willingness to cooperate with the investigation.[2] Salazar-Castaneda told Garcia that her usual car was a white 1988 Ford Mustang that she had owned for approximately seven years. A subsequent search confirmed Salazar-Castaneda's ownership of the Mustang and revealed at least five vehicles registered in her name.[3] A lane-

---

[1] A subsequent registration check revealed that the car was registered to a Monica Mesa on October 18, 2004. The address listed on the registration, however, was a post office box that belonged to someone else.

[2] Salazar-Castaneda also gave Garcia permission to search her cell phone. Although Salazar-Castaneda testified that her cell phone could not be used to call Mexico, her cell phone indicated that calls had been made to and received from Mexico on December 11 and 12.

[3] At trial, Salazar-Castaneda claimed to have only three cars registered under her name--a 1988 Ford Mustang, a 1997 Mercury, and a 1993 Jeep. When questioned about a 2000 Plymouth

crossing check indicated that all of these vehicles, except one, had made multiple crossings through various ports of entry between 2003 and June 2005.

Once Garcia informed her that something illegal had been discovered in her vehicle, Salazar-Castaneda surmised that it was "probably drugs" but did not further elaborate. She then explained that she was romantically involved with a man named Lencho Aguirre ("Aguirre"), who she claimed actually owned the Cavalier. According to Salazar-Castaneda, Aguirre let her borrow the Cavalier approximately two to three weeks after they met, particularly when she experienced mechanical problems with her Mustang. Salazar-Castaneda later learned from Aguirre's sister that Aguirre had been deported from the United States because of a previous drug-related conviction. Also, on at least one previous occasion, Aguirre specifically asked Salazar-Castaneda to "cross a car" containing drugs into the United States, but she refused to do so.

On the evening before her arrest, Salazar-Castaneda drove her Mustang to Mexico and attended a dance with Aguirre.[4] The following morning, Salazar-Castaneda allegedly experienced

Breeze registered under her name, Salazar-Castaneda claimed that her son had traded in such a vehicle for the 1993 Jeep. She claimed to be unaware of a 1994 Ford also registered under her name.

[4] According to Salazar-Castaneda, the couple attended a traditional Mexican holiday celebration known as "los matachines," at which Aguirre was apparently a dancer.

-4-

mechanical problems with her Mustang and agreed to drive Aguirre's Cavalier back to El Paso, apparently in exchange for Aguirre offering to send her money to fix her Mercury back in the United States. She was subsequently stopped at the Ysleta Port of Entry near El Paso, Texas, which eventually gave rise to her indictment on charges of importation of and possession with intent to distribute marijuana in violation of 21 U.S.C. §§ 952(a), 960(a)(1), and 841(a)(1), respectively.

Salazar-Castaneda's first trial resulted in a mistrial on April 27, 2005. Before her second trial was submitted to the jury, Salazar-Castaneda's counsel moved in open court for a judgment of acquittal. The district judge orally denied the motion and submitted the case to the jury at the close of all evidence. The jury returned a verdict convicting Salazar-Castaneda on both counts listed in the indictment on August 31, 2005. On November 28, 2005, the district court sentenced Salazar-Castaneda to twenty-one months on each count, to be served concurrently, three years of non-reporting supervised release, and a $200 special assessment. Salazar-Castaneda timely appealed her conviction and sentence on November 29, 2005.

## II. DISCUSSION

On this appeal, Salazar-Castaneda challenges only the sufficiency of the evidence with respect to establishing that she knew that marijuana was concealed in the vehicle. The government

responds that there was ample circumstantial evidence to support the jury's verdict and that the jury simply rejected Salazar-Castaneda's version of the events.

In reviewing the sufficiency of the evidence, we must consider the evidence, whether direct or circumstantial, in the light most favorable to the government, drawing all reasonable inferences and credibility choices in support of the jury's verdict.  See United States v. Cano-Guel, 167 F.3d 900, 904 (5th Cir. 1999); United States v. Anchondo-Sandoval, 910 F.2d 1234, 1236 (5th Cir. 1990).  The evidence is sufficient if a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  See Cano-Guel, 167 F.3d at 904; Anchodo-Sandoval, 910 F.2d at 1236.  The evidence need not exclude every reasonable hypothesis of innocence, and the jury is free to choose among reasonable constructions of the evidence.  See United States v. Lopez, 74 F.3d 575, 577 (5th Cir. 1996).  We have cautioned, however, that reversal is required if the evidence gives "equal or nearly equal circumstantial support" to a theory of guilt and a theory of innocence.  United States v. Sanchez, 961 F.2d 1169, 1173 (5th Cir. 1992) (citing Clark v. Procunier, 755 F.2d 394, 396 (5th Cir. 1985)).

A conviction for the offense of importation of marijuana under 21 U.S.C. § 952(a) requires proof that: (1) the defendant played a role in bringing a quantity of marijuana into the United

States from a place outside the United States; (2) the defendant knew the substance was marijuana; and (3) the defendant knew the substance would enter the United States. See United States v. Casilla, 20 F.3d 600, 603 (5th Cir. 1994). In contrast, a conviction for the offense of possession of marijuana with intent to distribute under 21 U.S.C. § 841(a)(1) requires proof that the defendant (1) knowingly (2) possessed marijuana (3) with intent to distribute it. See Lopez, 74 F.3d at 577. Under both statutory provisions, the government must adduce sufficient evidence of guilty knowledge to convict. See Cano-Guel, 167 F.3d at 904.

Because Salazar-Castaneda challenges only the sufficiency of the evidence to establish the requisite knowledge elements of her offenses, we further note that "[p]ossession of or control over a vehicle does not, standing alone, suffice to prove guilty knowledge." Anchondo-Sandoval, 910 F.2d at 1236 (citing United States v. Martinez-Mercado, 888 F.2d 1484, 1491 (5th Cir. 1989); United States v. Olivier-Becerril, 861 F.2d 424, 426 (5th Cir. 1988)). Additionally, in a case such as the this, where the illegal drugs are found within "hidden compartments" of the vehicle, the court will sustain a jury's guilty verdict if the government produces additional circumstantial evidence that is suspicious in nature or demonstrates guilty knowledge. Cano-Guel, 167 F.3d at 904. "This requirement stems from the recognition that, in hidden compartment cases, there 'is at least

-7-

a fair assumption that a third party might have concealed the controlled substances in the vehicle with the intent to use the unwitting defendant as the carrier in a smuggling enterprise.'" Id. (quoting United States v. Diaz-Carreon, 915 F.2d 951, 954 (5th Cir. 1990)).

Salazar-Castaneda insists that the gaps and inconsistencies in her version of the events can be attributed to simple linguistic misunderstandings with the government officials,[5] rather than bases on which the jury could reasonably infer that she knew that she was transporting drugs across the border. Moreover, she contends that any display of nervousness was a natural reaction to the circumstances and not related to any underlying awareness of criminal behavior. See United States v. Jones, 185 F.3d 459, 464 (5th Cir. 1999) ("While nervousness alone is insufficient, it may support an inference of guilty knowledge when combined with facts suggesting that the nervousness is derived from an underlying consciousness of criminal behavior."). The government responds that the inherent inconsistencies in Salazar-Castaneda's story combined with the ample circumstantial evidence of her guilt are sufficient to

---

[5] For instance, Salazar Castaneda contends that she never lied about ownership of the Cavalier; instead, she claims that her answers reflected an understandable confusion between "ownership" and mere "possession" in the Spanish translation of the question. Similarly, Salazar-Castaneda maintains that she never claimed to have been "belly dancing" the night before her arrest, but that Kraft had simply misheard the Spanish word "baile," which means "dance" in Spanish.

sustain the jury's verdict.

Upon our review of the record, we agree with the government. First, the seizure of more than seventy-five pounds of marijuana valued at approximately $24,000 from the vehicle provides circumstantial support for the inference that Salazar-Castaneda was aware of her criminal conduct. We have previously recognized that the value and quantity of the drug being transported may provide valuable circumstantial evidence of guilt. See, e.g., United States v. Villarreal, 324 F.3d 319, 324 (5th Cir. 2003); United States v. Garcia-Flores, 246 F.3d 451, 455 (5th Cir. 2001); United States v. Ramos-Garcia, 184 F.3d 463, 466 (5th Cir. 1999). Moreover, putting aside the arguably innocent misunderstandings and inconsistencies in her version of the events, the government correctly points out that Salazar-Castaneda admitted to knowledge of Aguirre's past drug conviction and acknowledged that he had previously requested she "cross a car" for him. See Ramos-Garcia, 184 F.3d at 466 (concluding, in a similar drug-trafficking case, that "failure to ask any questions about the trip smacks of a willful ignorance consistent with guilty knowledge"). Finally, in light of the aforementioned circumstantial evidence, the jury was permitted to draw the reasonable inference that Salazar-Castaneda's nervous behavior during the investigation at the border was related to her guilty knowledge. Id. ("Viewed in context with the implausibility of

[the defendant's] story, the jury could have inferred [the defendant's] guilty knowledge from his nervousness under questioning.").  Accordingly, drawing all reasonable inferences and credibility choices in favor of the jury's verdict, we conclude that the evidence sufficiently established the requisite knowledge to sustain Salazar-Castaneda's conviction and sentence.

## III.  CONCLUSION

For the foregoing reasons, we AFFIRM both Salazar-Castaneda's conviction and sentence.